SUPREME COURT OF ARIZONA
En Banc

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | Arizona Supreme Court |
| | ) | No. CR-10-0196-AP |
| Appellee, | ) | |
| | ) | Maricopa County |
| v. | ) | Superior Court |
| | ) | No. CR2006-129786 |
| STEVEN JOHN PARKER, | ) | |
| | ) | **O P I N I O N** |
| Appellant. | ) | |
| _____ | ) | |

Appeal from the Superior Court in Maricopa County
The Honorable Roland J. Steinle, Judge

**AFFIRMED**

_____

THOMAS C. HORNE, ARIZONA ATTORNEY GENERAL                Phoenix
     By   Kent E. Cattani, Chief Counsel,
          Criminal Appeals/Capital Litigation
          John Pressley Todd, Assistant Attorney General
          Jeffrey A. Zick, Assistant Attorney General
Attorneys for State of Arizona

DAVID GOLDBERG ATTORNEY AT LAW                     Fort Collins, CO
     By   David Goldberg
Attorney for Steven John Parker

_____

**B E R C H**, Chief Justice

**¶1**      Steven John Parker was sentenced to death for two murders, and this automatic appeal followed.  We have jurisdiction under Article 6, Section 5(3) of the Arizona Constitution and A.R.S. § 13-4031.

## I.   FACTS AND PROCEDURAL HISTORY[1]

**¶2**     Wayne and Faye Smith were found murdered in their home on September 26, 2005.  Faye's ankles were bound, and she had been stabbed to death.  Wayne also had been stabbed several times, but died from blunt force trauma to his head.  The medical examiner could not determine the time of death for either victim, but they were last seen alive two days earlier, on September 24.

**¶3**     Wayne's wallet and Faye's purse were missing from the home.  On September 24, 2005, between 4:50 and 5:30 p.m., someone used the Smiths' credit and bank cards at several locations near their home.  The next day, the cards were used at an ATM in Quartzsite, Arizona, and at a gas station in Temecula, California.

**¶4**     At the time of the murders, Parker lived next door to the Smiths with a roommate, Tasha Uhl.  On September 24, the likely day of the murders, Uhl could not find Parker around 2:30 or 3:00 in the afternoon, despite calling for him both inside and outside the house.  Parker later came in and told Uhl he had been doing yard work and had not heard her call.  Uhl left around 5:00 p.m., and Parker's girlfriend picked him up from the

---

[1]     "We view the facts in the light most favorable to sustaining the verdict."  *State v. Dann*, 205 Ariz. 557, 562 ¶ 2, 74 P.3d 231, 236 (2003).

house just over an hour later. The two were together until the morning of Sunday, September 25.

¶5 That day, Parker left in Uhl's car without her permission. At the time, Parker owed money to his employer. He drove to Mexico and then to California. He abandoned the car in San Diego and hitched a ride to Chino, California, where friends told him he was a "person of interest" in the Smiths' murders. Parker then took a bus to Las Vegas, where he remained for four days until he was arrested and jailed on October 13, 2005. Police questioned Parker about the murders, but charged him only with stealing Uhl's car and his employer's money. Parker eventually pleaded guilty to stealing from his employer and was sentenced to probation.

¶6 Shortly after Parker's release from jail, testing revealed that Parker's DNA matched DNA from a drop of blood found on the Smiths' kitchen sink and DNA from a napkin found on the kitchen counter. Police arrested Parker again on May 26, 2006, and charged him with the murders, first degree burglary, and kidnapping.

¶7 At trial, Parker testified that he was not involved in the crimes and asserted that another man killed the Smiths. The jury found him guilty of all charges. The jury also found three aggravating factors: pecuniary gain, A.R.S. § 13-751(F)(5); especial cruelty, *id.* § 13-751(F)(6); and multiple homicides,

3

*id.* § 13-751(F)(8). After finding no mitigation sufficient to call for leniency, the jury determined that Parker should be sentenced to death for each murder.

## II. DISCUSSION

### A. Speedy Trial

**¶8** Parker argues that he was denied his right to a speedy trial in violation of the Sixth Amendment.[2] We review issues of constitutional law de novo and related factual determinations for abuse of discretion. *State v. Smith*, 215 Ariz. 221, 233 ¶ 57, 159 P.3d 531, 543 (2007).

**¶9** The Sixth Amendment's guarantee of a speedy trial protects a defendant's right to be brought to trial without undue delay. There is no bright line rule for how quickly a trial must occur. In evaluating such claims, courts weigh (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of the right to a speedy trial, and (4) the prejudice to the defendant. *Barker v. Wingo*, 407 U.S. 514, 530 (1972); *State v. Spreitz*, 190 Ariz. 129, 139, 945 P.2d 1260, 1270 (1997). Parker's trial began on March 15, 2010, three years and nine months after his May 26, 2006 arrest and June 6, 2006 indictment. Under the first *Barker* factor, this delay is sufficient to trigger the full *Barker* analysis.

---

[2] Parker waived his state speedy trial claim under Rule 8 of the Arizona Rules of Criminal Procedure and has not asserted a speedy trial right under the Arizona Constitution.

4

¶10    The second *Barker* factor requires examination of the reasons for the delay. *See Vermont v. Brillon*, 129 S. Ct. 1283, 1290 (2009) (analyzing "whether the government or the criminal defendant is more to blame for th[e] delay") (alteration in original).

¶11    During the first year of the case, the defense spent significant time pursuing a motion to remand the case to the grand jury, seeking special action review of the denial of that motion at the court of appeals, and petitioning for review to this Court.  On August 15, 2007, the State and defense counsel agreed to exclude 305 days from the time calculation, and Parker waived all applicable time limits.

¶12    Parker is also responsible for an eleven-month delay in 2008 and 2009.  He asked to delay his trial date because his lead defense attorney had another trial and needed more time to investigate.  The trial court rescheduled Parker's trial and excluded this time, with Parker's consent.

¶13    Parker's lead attorney then retired at the end of 2008. This caused an additional ten-month delay until March 15, 2010. The State is not responsible for defense counsel's decision to retire and the resulting delay.  *Cf. Dies v. State*, 926 So. 2d 910, 916-17 ¶ 15 (Miss. 2006) ("original judge's retirement and his replacement by the assistant district attorney who was

5

prosecuting this case was [not attributable to] either the State or [the defendant]").

¶14    Parker argues that the delays occasioned by defense counsel's trial schedule should not be attributed to him because they were caused by underfunding of the criminal justice system and the high number of capital cases in Maricopa County at the time. Delays caused by systemic breakdowns can be charged to the state in certain cases. *See Brillon*, 129 S. Ct. at 1292. This case, however, does not rise to that level. In *State v. Hanger*, for example, the county refused to pay defense counsel. 146 Ariz. 473, 474, 706 P.2d 1240, 1241 (App. 1985). And in *Doggett v. United States*, the government was negligent in tracking down the defendant and took eight years to prosecute the case. 505 U.S. 647, 652–53 (1992). Comparable circumstances are not present here.

¶15    The third *Barker* factor requires the defendant to assert his right to a speedy trial in order to establish a constitutional violation. *State v. Schaaf*, 169 Ariz. 323, 327, 819 P.2d 909, 913 (1991) (stating that speedy trial violation "is waived unless asserted promptly"). Parker did not assert his right to a speedy trial until February 24, 2009, two years and nine months after his arrest. Parker's delay in asserting his right weighs against him. *See, e.g., State v. Henry*, 176 Ariz. 569, 579, 863 P.2d 861, 871 (1993) (fourteen-month delay

6

in asserting right weighed against defendant); *Phan v. State*, 723 S.E.2d 876, 883 (Ga. 2012) (same, for three-and-a-half-year delay). Parker clearly consented to delays through June 2008, and once he began asserting his speedy trial right, his case went to trial within a year.

¶16 The fourth and most important *Barker* factor is whether the delay prejudiced the defendant. *State v. Soto*, 117 Ariz. 345, 348, 572 P.2d 1183, 1186 (1977). We assess prejudice in light of the interests that the speedy trial right protects against: (1) "oppressive pretrial incarceration," (2) "anxiety and concern of the accused," and (3) "the possibility that the defense will be impaired" by diminishing memories and loss of exculpatory evidence. *Barker*, 407 U.S. at 532. Of these forms of prejudice, "the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Id.*; *see Soto*, 117 Ariz. at 348, 572 P.2d at 1186.

¶17 The trial court found that Parker failed to show any prejudice other than pretrial incarceration. The court allowed Parker to supplement the record to show prejudice, but he did not do so. Instead, Parker argues that he did not need to show prejudice given the lengthy delay and the anxiety he suffered from his pre-trial incarceration.

¶18     Trial occurred almost four years after Parker was charged with the murders.  But like the defendant in *Spreitz*, Parker asserted no prejudice except that arising from his pre-trial incarceration.  *See Spreitz*, 190 Ariz. at 140, 945 P.2d at 1271 (noting that five years' incarceration "may have increased defendant's anxiety[,] . . . [but] the delay did not prejudice his ability to defend against the state's claims"); *Phan*, 723 S.E.2d at 883–84.  For these reasons, Parker has not established a violation of his Sixth Amendment right to a speedy trial.

   **B.   Voir Dire**

¶19     Parker argues that the trial court abused its discretion by limiting his questions during voir dire.  Over Parker's objection, the trial judge refused to include in juror questionnaires a question on whether prospective jurors would automatically vote for the death penalty.  The judge did, however, ask each panel of potential jurors this question and excused those who said they would automatically vote for death.  Defense counsel sought to probe further the remaining jurors' views on the death penalty, but the judge precluded questions about the jurors' feelings on the death penalty and what types of mitigation they would consider, characterizing them as "stakeout questions."

¶20     We review restrictions on the scope of voir dire for abuse of discretion.  *State v. Johnson*, 212 Ariz. 425, 434 ¶ 29,

133 P.3d 735, 744 (2006). Prohibiting any inquiry whatsoever about whether prospective jurors would automatically impose a death sentence, however, is structural error. *State v. Moore*, 222 Ariz. 1, 9 ¶ 33, 213 P.3d 150, 158 (2009) (citing *Morgan v. Illinois*, 504 U.S. 719, 729-30, 735-36 (1992)).

¶21 In *Morgan v. Illinois*, the United States Supreme Court held that defendants are entitled to discover through voir dire "whether a potential juror will automatically impose the death penalty once guilt is found." *State v. Jones*, 197 Ariz. 290, 303 ¶ 27, 4 P.3d 345, 358 (2000) (discussing *Morgan*). *Morgan* does not, however, require a trial court to permit open-ended questions about jurors' general views on the death penalty and mitigation, or whether jurors would impose the death penalty if they found specific aggravators. *Smith*, 215 Ariz. at 230-31 ¶¶ 40-43, 159 P.3d at 540-41. We have repeatedly rejected invitations to expand *Morgan*'s holding. *See id.*; *Johnson*, 212 Ariz. at 434-35 ¶¶ 31, 33, 133 P.3d at 744-45 (as to specific mitigating factors that would warrant leniency); *State v. Glassel*, 211 Ariz. 33, 45-46 ¶¶ 37, 39, 116 P.3d 1193, 1205-06 (2005) (as to jurors' understandings of the phrase "sufficiently substantial to call for leniency"). We similarly decline to do so here.

¶22 Although he denied Parker's request to include the *Morgan* question in the questionnaire, the trial judge did ask

9

that question of each panel of prospective jurors and dismissed those potential jurors who indicated they would automatically vote for death. We find no abuse of discretion.

### C. Excluded Testimony

¶23 Parker argues that the trial court erred by precluding some testimony as hearsay. At trial, Parker argued that a third party, Jason Randall, committed the murders. Parker attempted to use testimony from Casandra Manery to place Randall in the Smiths' home around the time of the murders.

¶24 A few years after the murders, police discovered that Manery had fraudulently accessed the Smiths' bank accounts. She testified at trial that she obtained the Smiths' bank information from Randall, who lived near the Smiths' house. At trial, Manery testified that she had told police during an earlier interview that "It was almost like [Randall] was going back to the house to try and get something out." She also recalled that Randall had taken the Smiths' bank records from their trash and had given them to her in late September or early October of 2005.

¶25 In an earlier interview, however, Manery had told a detective: "Really the way I remember it is that [Randall] told me that he got the information through the trash. But I thought at some point that he had told me that he had also gone inside the house to look for other things." Parker tried to elicit

10

this second statement from Manery as a statement against Randall's interest under Arizona Rule of Evidence 804(b)(3) (2010),[3] but the trial court excluded the statement.

¶26 During Parker's offer of proof, Parker asked Manery whether Randall said that he had gone into the Smiths' house. Manery stated, "I know I said that in these [police interrogation transcripts]. I've read that." She continued, "But I don't today remember if [Randall] told me that or not." The trial court excluded the prior statement, finding it "not inherently reliable" because Manery "ha[d] no independent recollection" of Randall having made the statement, and further noting that even in the police interview Manery was never clear that Randall had actually made the statement. We review a trial court's ruling on the admissibility of evidence under a hearsay exception for abuse of discretion. *State v. Tucker*, 205 Ariz. 157, 165 ¶ 41, 68 P.3d 110, 118 (2003).

¶27 Even if we assume Randall's statement qualified as a statement against his interest under Rule 804(b)(3), Manery's prior statement about Randall's statement is hearsay. Ariz. R. Evid. 801(c). She does not remember making the statement and cannot be examined about it. Further, during the police

---

[3] We cite the Arizona Rules of Evidence in effect during Parker's trial, recognizing that the Rules were amended effective January 1, 2012. *See* Ariz. R. Evid. prefatory cmt. to 2012 amends.

11

interview, Manery could not even say for sure that Randall ever made such a statement, in part, she said, because her extensive drug use affected her memory. And at trial, she had no memory whatsoever of Randall making the statement or of telling police about it.[4] Given the deficient indicia of reliability surrounding Manery's statement and the fact that Manery was allowed to testify that she had previously told police, "It was almost like [Randall] was going back to the house to try and get something out," we cannot conclude that the trial judge abused his discretion in precluding Manery's similar statement, "I thought at some point that he had told me that he had also gone inside the house to look for other things."

### D. Admitted Business Records

¶28 Parker asserts that the trial court improperly admitted a report of the Smiths' credit card transactions and Wayne's handwritten timesheets under the business records exception to the hearsay rule, Arizona Rule of Evidence 803(6). We review these rulings for abuse of discretion. *Tucker*, 205 Ariz. at 165 ¶ 41, 68 P.3d at 118. The business records exception requires that the record be made at or near the time of the entry by or from information transmitted by someone with knowledge, be kept in the ordinary course of business, be made as a regular

---

[4] Parker did not argue at trial that Manery's prior statement was admissible under Rule 803(5), the recorded recollection exception to the hearsay rule.

12

practice, and be testified to by a qualified witness.  Ariz. R. Evid. 803(6).

### 1.   Credit card report

**¶29**   At trial, the State introduced evidence of transactions on the Smiths' Capital One credit cards through videotaped deposition testimony of Keri Ward, a Capital One fraud investigator.  The State also introduced a report Ward prepared by copying and pasting the Smiths' credit card transaction information from Capital One's database.  Parker objected to the report, arguing that it was not prepared in the regular course of business.  The trial court overruled the objection.

**¶30**   Documents prepared solely for purposes of litigation generally are not made in the regular course of business.  *See Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1258–59 (9th Cir. 1984) (discussing Federal Rule of Evidence 803(6)).  If documents prepared for litigation are mere reproductions of regularly kept database records, however, such documents may qualify as business records.  *See U-Haul Int'l, Inc. v. Lumbermens Mut. Cas. Co.*, 576 F.3d 1040, 1043–44 (9th Cir. 2009) (discussing federal rule 803(6)); *see also* Jack B. Weinstein and Margaret A. Berger, Federal Evidence § 901.08[2], at 901–84 (Joseph M. McLaughlin ed., 2d ed., rev. 2012) ("[P]rintouts prepared specifically for litigation from databases that were compiled in the ordinary course of business are admissible as

13

business records to the same extent as if the printouts were, themselves, prepared in the ordinary course of business."). This is the case with the records at issue here.

¶31 Ward testified that Capital One regularly makes and keeps records of all credit card transactions. She described how merchants and other third parties transmit the information used to create the records. Although the records aid in fraud and police investigations, Ward indicated that the records serve several other business purposes, including billing, tracking spending habits, and resolving customer disputes. These facts qualify the entries in Ward's report as business records.

¶32 Further, Ward's report did not change the character of the records. Ward testified that she accessed the Smiths' account information in Capital One's computer and copied and pasted that information into a document she faxed to the police. Although Ward made the report at the request of the police, the information provided was identical to Capital One's business records. Because the report simply repeated information that was admissible as a business record, the report itself was likewise admissible. *See* Ariz. R. Evid. 1006; *U-Haul Int'l, Inc.*, 576 F.3d at 1043-44 (noting that "evidence that has been compiled from a computer database is also admissible as a business record" under corresponding federal rule 803(6)).

14

**¶33** Parker argues that there is a double hearsay problem because Ward did not know who transmitted the information into Capital One's database. But courts regularly admit business records even when the testifying witness did not assemble the complete record. *See, e.g.*, *United States v. Langford*, 647 F.3d 1309, 1326 (11th Cir. 2011) (records of credit card transactions properly admitted under federal rule 803(6) despite custodial witness "not hav[ing] personal knowledge of each of the records"); *State v. Veres*, 7 Ariz. App. 117, 125, 436 P.2d 629, 637 (1968) (to same effect), *overruled on other grounds by State v. Osborn*, 107 Ariz. 295, 295, 486 P.2d 777, 777 (1971); *see also* Weinstein's Federal Evidence § 803.08[8][a], at 803–84 to 803–86 ("The witness need not have . . . personally assembled the records . . . [,] [and t]here is no requirement that the records have been prepared by the entity that has custody of them . . . ."). Trustworthiness and reliability stem from the fact that Capital One regularly relies on the information that third parties submit as part of their ordinary course of business. *See, e.g.*, *United States v. Adefehinti*, 510 F.3d 319, 326 (D.C. Cir. 2007) (listing cases that permit business records of one entity to be admitted as a business record of another entity if the latter entity relies on those records and keeps them in the ordinary course of business). The trial court did

not abuse its discretion in admitting this evidence as a business record.

### 2. Handwritten timesheets

¶34 The State introduced Wayne's handwritten timesheets to impeach Parker's testimony about when he left the spot of blood on the Smiths' kitchen faucet and the DNA on the napkin. Parker testified that he cut his finger while helping Wayne with yard work around 2:00 p.m. on September 22, 2005. He further testified that he went to the Smiths' kitchen sink to clean the wound but saw dirty dishes in the sink, so he went to the bathroom to wash his hands. He said Faye gave him a napkin and a bandage for his cut.

¶35 Wayne's handwritten timesheets, however, showed that Wayne was at work until 4:30 p.m. on September 22, 2005. To lay the foundation for the timesheets, the State called Wayne's co-worker, Sean Kirk, who testified that Wayne routinely kept track of his work hours on such timesheets. Kirk testified that he saw Wayne write the week's first entry for Monday, September 19, 2005, and it was Wayne's habit to record or log his work hours each day. Kirk also testified that he was familiar with Wayne's handwriting and that the writing on the timesheets was Wayne's. Parker objected, arguing that the State failed to lay adequate foundation because Kirk did not actually see Wayne write the

entry on September 22. The trial court overruled this objection.

¶36     Even though Kirk did not see Wayne write the record on the day in question, his familiarity with Wayne's handwriting and process of writing timesheets was sufficient to allow him to lay foundation. Kirk testified that he had worked alongside Wayne for about a year and a half, he and Wayne performed the same job, they used the same system to create timesheets, he had seen Wayne fill out timesheets, and they prepared the records in the course of business at about the time they performed the work. This provides sufficient foundation. *Cf. State v. McCurdy*, 216 Ariz. 567, 571–72 ¶¶ 8–10, 169 P.3d 931, 935–36 (App. 2007) (finding jail supervisor qualified to lay foundation based on testimony that he had supervised new inmates, was familiar with process for filing property receipts, and knew that such receipts were a part of the jail's normal course of business).

¶37     Parker argues that *Standard Chartered PLC v. Price Waterhouse*, 190 Ariz. 6, 945 P.2d 317 (App. 1996), shows that the foundation was not adequate. But that case is inapposite. There, the trial court excluded a memorandum because the author did not prepare it "at or near" the time the events took place. *Id.* at 46, 945 P.2d at 357. Here, the timesheets were admitted based on Kirk's testimony that, among other things, Wayne

17

recorded his work hours close to the time he performed the work. The trial court did not abuse its discretion in admitting the timesheets as business records.

### E.    Confrontation Clause

¶38    Parker argues that admission of the credit card transaction information and timesheets violated his right to confrontation under the Sixth Amendment. We "independently review whether the government's proffered guarantees of trustworthiness satisfy the demands of the Clause." *Lilly v. Virginia*, 527 U.S. 116, 137 (1999). The Confrontation Clause bars admission of out of court testimonial evidence unless the defense has had an opportunity to cross-examine the declarant. *Crawford v. Washington*, 541 U.S. 36, 68 (2004). Testimonial evidence is "*ex parte* in-court testimony or its functional equivalent – that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially." *Id.* at 51.

¶39    By their nature, business records ordinarily are not testimonial. *See id.* at 56 (noting that most "hearsay exceptions cover[] statements that by their nature [a]re not testimonial – for example, business records"). This is so because business records are generally "created for the administration of an entity's affairs and not for the purpose of

18

establishing or proving some fact at trial." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324 (2009).

**¶40**     Parker argues that admission of the credit card transaction information violated the Confrontation Clause because Ward's report, having been created at the request of police, was testimonial, and he did not have the opportunity to cross-examine the sources who transmitted the transaction information to Capital One's database.  Although Ward created the report at the request of the police, the transaction information in the report is not testimonial.  The credit card records in Capital One's database are maintained to facilitate its business, not to aid police.  The third parties who transmit transaction information to Capitol One similarly do so to facilitate their own businesses, not to aid police investigations.   Parker's Confrontation Clause rights with respect to Ward were not violated because Ward was subject to cross-examination by Parker about the preparation of the report.

**¶41**     The Confrontation Clause does not require every person who participated in compiling information to testify in court. *See id.* at 311 n.1 (noting that gaps in the chain of custody go to the weight, not the admissibility, of the evidence, and not "everyone who laid hands on the evidence must be called").  Thus, admitting the Capital One credit card evidence did not violate the Confrontation Clause.

19

**¶42** Parker also contends that admitting Wayne's timesheets violated the Confrontation Clause because Wayne was not available as a witness and had not previously been cross-examined. Wayne prepared his timesheets as part of a routine business practice, not to aid a police investigation. This type of record is nontestimonial because it is "created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial." *Id.* at 324; *accord United States v. Yeley-Davis*, 632 F.3d 673, 679 (10th Cir. 2011). The admission of Wayne's timesheets thus did not violate the Confrontation Clause.

### F. Flight Instruction

**¶43** Parker argues that the trial court erred by instructing jurors that they could consider flight as evidence of consciousness of guilt. At trial, he testified that he left Phoenix on Sunday, September 25, 2005, because his girlfriend broke up with him that morning, and he had a history of leaving when faced with personal troubles.

**¶44** We review the trial court's decision to give a flight instruction for abuse of discretion. *State v. Dann* (*Dann II*), 220 Ariz. 351, 363-64 ¶ 51, 207 P.3d 604, 616-17 (2009). The trial court may give a flight instruction if the state presents evidence from which jurors may infer "consciousness of guilt for

the crime charged." *State v. Edwards*, 136 Ariz. 177, 184, 665 P.2d 59, 66 (1983).

¶45 The record reflects that the murders probably occurred the afternoon of Saturday, September 24, 2005. Sometime before 2:00 p.m. on Sunday, September 25, without notice to anyone and without permission, Parker drove his housemate's car to Mexico, where he remained for several days before driving to San Diego and abandoning the car. Parker then went to Chino, California, where friends told him Phoenix police wanted to speak with him. Instead of returning to Phoenix or contacting law enforcement, Parker took a bus to Santa Barbara. A few days later, he took another bus to Las Vegas, where police arrested him for theft on October 13.

¶46 Parker first argues that the trial court should not have given the flight instruction because he did not leave until the day after the murders ostensibly occurred. But this delay goes to the weight of the flight evidence; it does not preclude the trial court from giving a flight instruction. *Dann II*, 220 Ariz. at 363-64 ¶ 51, 207 P.3d at 616-17; *State v. Bible*, 175 Ariz. 549, 592, 858 P.2d 1152, 1195 (1993). This Court has approved flight instructions when the flight was more than one day removed from the commission of the crime. *E.g.*, *Edwards*, 136 Ariz. at 184, 665 P.2d at 66 (approving a flight instruction

where defendant fled fifteen months after the crime). The short delay here did not make giving a flight instruction improper.

¶47    Parker next argues that the trial court should not have given the flight instruction because law enforcement was not pursuing him when he left, and he did not attempt to conceal his identity. At least in part, this is not correct. While in Mexico, Parker gave a false name to a hitchhiker. Additionally, once he heard that police were looking for him, he did not return to Phoenix or contact authorities, but instead went to Santa Barbara and then Las Vegas.

¶48    In any event, neither pursuit by law enforcement nor complete concealment is required to support a flight instruction. *See State v. Noleen*, 142 Ariz. 101, 108, 688 P.2d 993, 1000 (1984) (approving flight instruction where defendant left the state and abandoned his car, even though police were not pursuing him and he used his own name when checking in at a motel). Rather, "[l]eaving the state justifies a flight instruction as long as it invites some suspicion of guilt." *State v. Thornton*, 187 Ariz. 325, 334, 929 P.2d 676, 685 (1996). Such an inference is reasonable here.

¶49    Parker cites *State v. Bailey*, 107 Ariz. 451, 489 P.2d 261 (1971), which held a flight instruction unwarranted on the unique facts presented. In *Bailey*, however, the defendant presented unrefuted evidence that he was near the crime when it

22

occurred only because he was driving home to Texas from Los Angeles, and he simply proceeded home. *Id.* at 451–52, 489 P.2d at 261–62. Here, by contrast, Parker fled from his residence rather than toward it and had no previous plans to leave the state.

**¶50** Finally, Parker's explanation for his flight did not preclude the trial court from giving a flight instruction. *See State v. Hunter*, 136 Ariz. 45, 49, 664 P.2d 195, 199 (1983) (defendant's alternative explanation for flight does not make instruction improper). It simply created a fact question for the jury to decide.

### G.   Third–Party Culpability Instruction

**¶51** Parker argues that the trial court erred by not instructing the jury on third-party culpability at the close of the guilt phase of the trial. The judge declined to give Parker's requested instruction because it commented on the evidence. *See* Ariz. Const. art. 6, § 27 (instructions may not comment on the evidence); *State v. Roque*, 213 Ariz. 193, 213 ¶ 66, 141 P.3d 368, 388 (2006) (same). The judge suggested an alternative instruction, but Parker objected because he believed it incorrectly stated the law.

**¶52** Parker then requested the following instruction:

Steven Parker contends that he did not kill Wayne Smith or Faye Smith.

23

In order for you to consider a third-party culpability defense, Defendant must show some evidence concerning a third person or third persons that *tends* to create reasonable doubt as to his guilt. Defendant does not need to prove beyond a reasonable doubt that the third party is guilty of the charged offenses. The evidence need only *tend* to show that a third person or persons committed the offenses and thus *tend* to create reasonable doubt as to Defendant's guilt.

You may also consider that Mr. Randall was served with a subpoena, that he is under court order to appear, that he has failed to appear, and that a warrant has been issued for his arrest for the failure to appear. Mr. Randall's flight is not sufficient in itself to establish guilt, but it is a fact which you may consider in the light of all other facts concerning Mr. Randall.

The judge declined to give this instruction because, among other things, it set forth the standard for admitting third-party culpability evidence, not the standard for the jury to use in evaluating such evidence. Noting that other instructions adequately dealt with the substance of the requested instruction, the judge invited Parker to submit a modified instruction, but the record does not reflect that Parker ever did so. The judge also invited the parties to argue third-party culpability in closing.

¶**53** On appeal, Parker concedes that his proposed instruction improperly comments on the evidence, but now argues that the trial court should have given just the middle paragraph from his instruction. We review a trial court's decision to

24

refuse a jury instruction for abuse of discretion. *State v. Bolton*, 182 Ariz. 290, 309, 896 P.2d 830, 849 (1995).

**¶54** A trial judge must instruct the jury "on any theory reasonably supported by the evidence." *State v. Moody*, 208 Ariz. 424, 467 ¶ 197, 94 P.3d 1119, 1162 (2004). A trial judge, however, need not give a proposed jury instruction when its substance is adequately covered by other instructions or it incorrectly states the law. *State v. Rodriguez*, 192 Ariz. 58, 61 ¶ 16, 961 P.2d 1006, 1009 (1998). Moreover, a trial judge has no duty to parse the proposed instruction for the accurate portions. *Hammels v. Britten*, 53 Ariz. 112, 120, 85 P.2d 992, 995 (1939).

**¶55** In arguing that a third-party culpability instruction was required, Parker cites *State v. Gibson*, 202 Ariz. 321, 44 P.3d 1001 (2002), and *State v. Prion*, 203 Ariz. 157, 52 P.3d 189 (2002). But *Gibson* and *Prion* dealt with the admissibility of third-party culpability evidence, not third-party culpability jury instructions. *See Prion*, 203 Ariz. at 161-62 ¶¶ 19-27, 52 P.3d at 193-94; *Gibson*, 202 Ariz. at 323-24 ¶¶ 11-19, 44 P.3d at 1003-04. No Arizona case has required a third-party culpability instruction.

**¶56** Nor was such an instruction required here. Although Parker contends that the proposed instruction was needed to prevent the jury from improperly shifting the burden of proof

25

from the State, the court instructed the jury on the presumption of innocence and the State's burden of proving beyond a reasonable doubt all elements of the crimes charged. *See People v. Abilez*, 161 P.3d 58, 91-92 (Cal. 2007) (finding any error in failure to give third-party culpability instruction harmless where jury was instructed on presumption of innocence and burden of proof); *State v. Berger*, 733 A.2d 156, 168 (Conn. 1999) (holding third-party culpability instruction unnecessary where jury was instructed on presumption of innocence and burden of proof). Thus, the substance of the instruction was adequately covered, and we find no reversible error.

### H.   Fifth Amendment

¶57    Parker argues that his Fifth Amendment rights were violated by the admission of his videotaped interviews with police and by the prosecutor's comments on his statements in those interviews.

¶58    Before trial, Parker sought to exclude two recorded interviews with police on the grounds that his statements were involuntary. After a hearing, the trial judge declined to preclude the admission of either interview. At trial, both interviews were admitted into evidence by stipulation and played for the jurors. Parker ended each interrogation by invoking his right to counsel, and both invocations were played to the jury without objection.

26

¶59 In closing argument, the prosecutor commented on the fact that Parker ended the first interview. The trial court sustained Parker's objection and granted his motion to strike.

¶60 The following morning, Parker moved for a mistrial, arguing that the prosecutor had improperly commented on his invocation of his Fifth Amendment rights. The trial court denied the motion, noting that the jury had seen Parker end the interview on the videotape.

¶61 Parker's stipulation to admit the videotaped interviews precludes him from asserting on appeal that their admission was error. *See State v. Pandeli*, 215 Ariz. 514, 528 ¶ 50, 161 P.3d 557, 571 (2007) (discussing invited error doctrine).

¶62 Parker argues, however, that the voluntariness hearing preserved his objection to the admissibility of the videos and that the State had agreed to redact the invocations. But the voluntariness hearing addressed whether Parker's statements in the videos were voluntary and did not involve objections to the admissibility of the videos on other grounds. On appeal, Parker does not challenge the voluntariness finding and cannot now press objections to the admissibility of the videos that were not made at or before trial. Moreover, the record does not reflect that the State agreed to redact the invocations or that Parker ever requested that they be redacted. As such, any error in admitting the videotaped interviews was not fundamental.

27

**¶63** We therefore review the trial court's denial of Parker's motion for mistrial based on the prosecutor's allegedly improper comments. We review that ruling for abuse of discretion. *State v. Nelson*, 229 Ariz. 180, 189 ¶¶ 35-36, 273 P.3d 632, 641 (2012).

**¶64** A prosecutor may not comment on a defendant's invocation of his Fifth Amendment rights. *Doyle v. Ohio*, 426 U.S. 610, 618-19 (1976); *State v. Carrillo*, 156 Ariz. 125, 128, 750 P.2d 883, 886 (1988). On appeal, Parker argues that three of the prosecutor's statements during closing argument commented on his invocation. The first two statements are as follows:

> (1) But most importantly, why didn't the Defendant answer Detective Branch's questions about those credit cards?

> (2) Because the person that took those credit cards murdered these people, and the only person that did that was this defendant. And this defendant when he had the chance to deny it, didn't.

**¶65** Neither statement improperly commented on Parker's invocations of his Fifth Amendment rights. Rather, when viewed in context, these statements highlighted Parker's evasive answers to questions about use of the Smiths' credit cards. As evidence of evasiveness, the prosecutor noted that, when asked about the credit cards, Parker stated, "I don't have them now," instead of denying having taken or used them. In addition, instead of denying taking or using the cards, Parker said "[i]f

28

I tell you that I took them, if I tell you that I used them . . . [t]hen you're going to think I did it." The prosecutor's statements were permissible comments on Parker's statements, not comments on his invocation of his Fifth Amendment rights. *See Anderson v. Charles*, 447 U.S. 404, 408 (1980) (stating that "[a]s to the subject matter of his statements, the defendant has not remained silent at all"); *State v. Anaya*, 170 Ariz. 436, 441–42, 825 P.2d 961, 966–67 (App. 1991) (admitting co-defendant's failure to claim self-defense post-arrest because statements were made).

**¶66** The prosecutor's third statement is more troubling. In the first interview played to the jury, Parker asked to end the interview until he could speak with counsel. During closing arguments, defense counsel asserted that investigators had not thoroughly interviewed Parker. In rebuttal, the prosecutor said:

> And [defense counsel] . . . accuses Detective Branch of not doing a good enough interview of the defendant. Watch that interview again, that first one, and take account of who stopped that interview. Who terminated it?

The trial court sustained Parker's objections and granted his motion to strike.

**¶67** While the prosecutor arguably was responding to Parker's claim that the interview was not adequate, the statement could also be interpreted as asking the jury to draw a

29

negative inference from Parker's invocation of his Fifth Amendment rights, and thus was improper. *See Doyle*, 426 U.S. at 618–19; *State v. Bowie*, 119 Ariz. 336, 341, 580 P.2d 1190, 1195 (1978). When a defendant in custody initially speaks with the police but then asks to remain silent, the prosecutor may comment on the statements made, but not on the defendant's invocation of his rights. *State v. Guerra*, 161 Ariz. 289, 296, 778 P.2d 1185, 1192 (1989). We have held similar comments to be improper and have reversed convictions for improper comments on a defendant's invocation of his Fifth Amendment rights.[5] *See State v. Sorrell*, 132 Ariz. 328, 329–30, 645 P.2d 1242, 1243–44 (1982).

**¶68** Here, however, the comment does not constitute reversible error. Parker stipulated to the admission of the videotapes and they were played for the jury; thus, the jurors already knew that Parker had invoked his right to counsel in the interviews. Although we urge prosecutors to refrain from venturing even close to commenting on a defendant's exercise of the significant rights protected by the Fifth Amendment, the prosecutor here was not suggesting that Parker was guilty or lying because he invoked his right to counsel. *Cf. id.* at 329,

---

[5] Parker argues that we should review this issue under the cumulative prosecutorial misconduct analysis from *State v. Hughes*, 193 Ariz. 72, 79 ¶¶ 26–27, 969 P.2d 1184, 1191 (1998). This standard is inapplicable, however, where, as here, the prosecutor made only one improper statement.

645 P.2d at 1243 (reversing where prosecutor suggested defendant was lying because he invoked his right to remain silent for an hour before telling police his story). Rather, the prosecutor was responding to defense counsel's charge that the police did not thoroughly interview Parker, suggesting that detectives might have asked more questions had Parker not terminated the interview. Moreover, the trial court sustained Parker's objection to the statement and granted his motion to strike. In these circumstances, the trial judge did not abuse his discretion by striking the comment and denying Parker's mistrial motion.

### I. Motion for Judgment of Acquittal

¶69 Parker contends that he was entitled to a judgment of acquittal because the State failed to present substantial evidence to support a conviction. *See* Ariz. R. Crim. P. 20(a). We review the trial court's denial of a Rule 20 motion de novo. *Bible*, 175 Ariz. at 595, 858 P.2d at 1198.

¶70 On a Rule 20 motion for a judgment of acquittal, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. West*, 226 Ariz. 559, 562 ¶ 16, 250 P.3d 1188, 1191 (2011). Substantial evidence is "such proof that

31

reasonable persons could accept as adequate and sufficient to support a conclusion of defendant's guilt beyond a reasonable doubt." *West*, 226 Ariz. at 562 ¶ 16, 250 P.3d at 1191.

**¶71** The following circumstantial evidence links Parker to the crime: DNA from a napkin and a drop of blood found in the Smiths' house, the latter of which also contained DNA consistent with Faye; Parker's trip to Mexico the day after the murders; the use of the Smiths' credit cards near Parker's home, including at a bar that Parker had visited, and on one route to Mexico at the time Parker was driving there; Tasha Uhl's statements placing Parker near the Smiths' home around the time of the murders; and Parker's evasive answers to police questions regarding whether he had taken or used the Smiths' credit cards. Parker also admitted owing money to his employer at the time of the crimes, making financial difficulties a potential motive. We have held similar circumstantial evidence sufficient to support a jury's finding of guilt beyond a reasonable doubt. *See State v. Atwood*, 171 Ariz. 576, 599, 832 P.2d 593, 616 (1992), *overruled on other grounds by State v. Nordstrom*, 200 Ariz. 229, 241 ¶ 25, 25 P.3d 717, 729 (2001).

**¶72** Although Parker offered an explanation for the presence of his blood and DNA in the Smiths' home, other evidence undercut that explanation, particularly Wayne's timesheets and phone records showing that Faye called Wayne's cell phone during

32

the time Parker was allegedly helping Wayne work at the Smiths' house. The same is true regarding Parker's flight; a reasonable juror could have rejected Parker's explanations. Viewed in the light most favorable to upholding the jury's verdicts, this evidence is sufficient to support the guilty verdicts.

¶73 Parker argues that substantial doubt exists concerning his guilt because evidence shows that Jason Randall might have had a motive to kill the Smiths and might have been inside the Smiths' home around the time of their murders, and Randall failed to respond to a subpoena. The jurors heard most of this evidence, but rejected it. They heard that Randall absconded despite having been served with a subpoena. And although the trial court did not permit Casandra Manery to testify that Randall might have told her he had gone inside the Smiths' house, Manery was permitted to confirm that she had previously said, "It was almost like [Randall] was going back to the house to try and get something out." The jury also heard that hairs found in Wayne's mouth did not match either Parker or the Smiths. Finally, Parker testified at trial and offered his alternative explanations for his flight, the presence of his blood and DNA in the home, and Randall's potential role in the murders. The jury rejected Parker's defense. *See State v. Clemons*, 110 Ariz. 555, 556–57, 521 P.2d 987, 988–89 (1974) (noting that it is the jury's exclusive role to weigh the

33

credibility of testimony, including the defendant's). In sum, the State presented substantial evidence to support the jury's verdicts.

### J. Motion for New Trial

**¶74** Parker argues that his convictions are contrary to the weight of the evidence and that the trial judge applied the wrong standard in reviewing his motion for a new trial. *See* Ariz. R. Crim. P. 24.1(c)(1). A motion for new trial should be granted "only if the evidence was insufficient to support a finding beyond a reasonable doubt that the defendant committed the crime." *State v. Landrigan*, 176 Ariz. 1, 4, 859 P.2d 111, 114 (1993). We review the trial court's decision for abuse of discretion. *Id.* As explained, *supra* ¶¶ 71-73, sufficient evidence supported the verdicts.

**¶75** Further, there is no indication that the trial judge applied an incorrect standard. The trial court denied the motion "[b]ased upon [its] review, and for the reasons stated in the responses filed by the State." Parker's motion for a new trial did not raise any new issues or cite new legal authority. We cannot say that the trial judge abused his discretion in denying the motion.

### K. Motion to Vacate the Judgment

**¶76** Parker argues that the trial judge abused his discretion by denying Parker's motion to vacate the judgment

34

because newly discovered evidence undermined the verdicts. *See* Ariz. R. Crim. P. 24.2(a)(2). During jury deliberations, Jason Randall reappeared and Parker deposed him on May 21, 2010. At the deposition, Randall repeatedly invoked his privilege against self incrimination and stated that, if called to testify at trial, he would refuse. Randall provided a hair sample for testing to compare it to hairs found in Wayne's mouth and hand.

¶77 Based on these developments, Parker filed a motion to vacate the judgment, arguing that newly discovered material facts existed that would have changed the verdict. After briefing, the trial court denied this motion.

¶78 We review a trial court's denial of a motion to vacate a judgment for abuse of discretion. *State v. Orantez*, 183 Ariz. 218, 221, 902 P.2d 824, 827 (1995). We afford trial judges great discretion given their "special perspective of the relationship between the evidence and the verdict which cannot be recreated by a reviewing court from the printed record." *Reeves v. Markle*, 119 Ariz. 159, 163, 579 P.2d 1382, 1386 (1978). To prevail on a motion to vacate the judgment based on newly discovered evidence, the

> [d]efendant must show that (1) the newly discovered evidence is material; (2) the evidence was discovered after trial; (3) due diligence was exercised in discovering the material facts; (4) the evidence is not merely cumulative or impeaching, unless the impeachment evidence substantially undermines testimony that was of critical significance at trial;

35

and (5) . . . the new evidence, if introduced, would probably change the verdict or sentence in a new trial.

*Orantez*, 183 Ariz. at 221, 902 P.2d at 827.

¶79	Parker asserts that Randall's hair sample and the opportunity to put Randall on the stand are newly discovered evidence. Even if such evidence was newly discovered, material, impeaching, and not cumulative, it is unlikely that the evidence would have changed the result in this case. The jury already heard that Randall absconded despite having been subpoenaed and that the hairs in Wayne's mouth did not match Parker or the Smiths. Further, Parker's counsel thoroughly argued during closing argument that Randall could have been inside the Smiths' house and that his hair could match the hair found in Wayne's hand and mouth. Given that the hairs were later found not to match Randall's, Parker actually benefitted from not being able to test Randall's hair earlier.

¶80	The trial court did not abuse its discretion in denying the motion to vacate the judgment.

## L.	Cumulative Effect of Evidentiary Errors

¶81	Parker acknowledges that we have rejected the cumulative error doctrine, but urges us to adopt the doctrine and find that the cumulative effect of the evidentiary errors here constitutes reversible error. We decline to revisit our longstanding precedent. *See Hughes*, 193 Ariz. at 78–79 ¶ 25, 969

36

P.2d at 1190–91 (explaining that we do not recognize the cumulative error doctrine).

### III.  ABUSE OF DISCRETION REVIEW

¶82      We review Parker's death sentence to "determine whether the trier of fact abused its discretion in finding aggravating circumstances and imposing a sentence of death."  A.R.S. § 13-756(A).  The trier of fact did not abuse its discretion if "there is any reasonable evidence in the record to sustain it." *State v. Delahanty*, 226 Ariz. 502, 508 ¶ 36, 250 P.3d 1131, 1137 (2010).

### A.  Proper Standard of Review and Constitutionality of A.R.S. § 13-756(A)

¶83      Parker argues that we have incorrectly applied abuse of discretion review to capital cases and that abuse of discretion review as now conducted violates the Eighth and Fourteenth Amendments.  Parker acknowledges that we have rejected these arguments before.  *State v. Cota*, 229 Ariz. 136, 153 ¶¶ 91-92, 272 P.3d 1027, 1044 (2012); *Nelson*, 229 Ariz. at 191 ¶ 50, 273 P.3d at 643.  He argues, however, that we should reconsider those holdings, because they misapply *Clemons v. Mississippi*, 494 U.S. 738 (1990), which requires "meaningful" appellate review of death sentences.  But in *Cota*, we observed that "[m]eaningful appellate review requires only that an appellate court 'consider whether the evidence is such that the sentencer

37

could have arrived at the death sentence that was imposed,' not whether the appellate court itself would have imposed a death sentence." 229 Ariz. at 153 ¶ 92, 272 P.3d at 1044 (quoting *Clemons*, 494 U.S. at 749). We decline to reconsider this conclusion.

### B. Aggravating Circumstances

¶84 In the aggravation phase, the jury found three aggravators for each murder: pecuniary gain, especial cruelty, and multiple homicides. A.R.S. § 13-751(F)(5), (6), (8). On appeal, Parker contests these findings.

¶85 The jury did not abuse its discretion in finding the pecuniary gain aggravator, § 13-751(F)(5). To prove this aggravator, the state must show that "the expectation of pecuniary gain is a motive, cause, or impetus for the murder and not merely a result of the murder." *State v. Hyde*, 186 Ariz. 252, 280, 921 P.2d 655, 683 (1996). Here, the State introduced evidence that Wayne's wallet and Faye's purse were missing after the murders. Their credit and bank cards were used several times in the following days, including once at a bar that Parker had visited for a poker tournament and possibly again during the week of the murders, and on a route to Mexico at the time Parker was driving there. In addition, the State introduced evidence that Parker had financial problems when the murders occurred. The evidence of Parker's financial troubles, the use of the

Smiths' credit and bank cards, and the inferences that can be drawn from that evidence support the jury's finding of the pecuniary gain aggravator. *Cf. State v. Lynch*, 225 Ariz. 27, 40 ¶¶ 69–73, 234 P.3d 595, 608 (2010) (finding on independent review that use of the victim's bank cards after the murder, along with other evidence, was sufficient to establish the (F)(5) aggravator).

¶86     The jury also did not abuse its discretion in finding the especial cruelty aggravator, § 13-751(F)(6).  To prove this aggravator, the state must establish "that a victim was conscious and suffered physical pain or mental anguish before death and that the defendant knew or should have known that the victim would suffer."  *State v. Morris*, 215 Ariz. 324, 341 ¶ 79, 160 P.3d 203, 220 (2007).

¶87     In this case, there was evidence that both Wayne and Faye were conscious during the attack and that they suffered. Wayne had several stab wounds, and the location of the wounds and the blood spatter indicate that he was stabbed before receiving the blunt force injury that killed him.  Further, the blood spatter expert testified that Wayne likely tried to come to Faye's aid after he was initially attacked, suggesting that Wayne remained conscious and suffered physical pain and mental anguish.  *See State v. Prince*, 226 Ariz. 516, 540 ¶¶ 99–101, 250 P.3d 1145, 1169 (2011) (finding especial cruelty supported by

39

evidence that victim saw the assailant attack her mother immediately before the murder).

**¶88**    As for Faye, her ankles were bound with speaker wire and she had ligature marks and bruises, caused by blunt force trauma likely inflicted before her death, on her leg and foot. She also suffered knife wounds to her left hand and face. Although she would have remained conscious only a short while after her fatal injury — a stab wound to her chest that cut her aorta — even this small period of suffering can establish especial cruelty. *See id.* at 540 ¶ 98 n.7, 250 P.3d at 1169 n.7 (listing cases in which a finding of especial cruelty was upheld based on time periods of suffering ranging from eighteen seconds to three minutes). Further, that Faye was bound supports a finding that she was conscious, and so would have suffered mental anguish. *See Lynch*, 225 Ariz. at 41 ¶ 79, 234 P.3d at 609 (mental anguish proved by evidence that victim was bound and showed signs of struggling). Given this evidence, the jury did not abuse its discretion in finding the (F)(6) aggravator proven.

**¶89**    Finally, the jury did not abuse its discretion in finding the multiple homicides aggravator, § 13-751(F)(8). To prove this aggravator, the state must show that the murders were "temporally, spatially, and motivationally related, taking place during one continuous course of criminal conduct." *Dann II*, 220

40

Ariz. at 364 ¶ 57, 207 P.3d at 617. Parker argues that the evidence suggesting that Wayne came to Faye's aid indicates that, even if Parker was the initial assailant, he killed Wayne in self-defense and, thus, did not have the same motivation for Wayne's killing as for Faye's. The jury, however, could have inferred that both homicides were committed during the same course of conduct and with the same motive, whether pecuniary gain or another motive. In sum, the jury did not abuse its discretion by finding the (F)(8) aggravator proven.

## C.   Death Sentence

¶90     Finally, we find that the jury did not abuse its discretion in imposing the death sentence. Parker presented mitigating evidence that "he is a highly intelligent, nonviolent young man who loves his children and family and these acts are diametrically opposed to his character, intellect and psychology." This evidence included IQ scores of 129 and 135, grades in the top five percent of his class, participation in high school sports, and attendance at the University of Arizona where he worked in the library and residence halls. Friends and family testified to Parker's good character. The mitigation specialist found no evidence of a troubled childhood, and a forensic neuropsychologist testified that he found "no indication of any psychiatric disturbance," mental illness, brain damage, or antisocial personality disorder in Parker.

41

Even if we assume that Parker proved all of his mitigating factors, the jury did not abuse its discretion in concluding that leniency was not warranted.

## IV. CONCLUSION

¶91      We affirm Parker's convictions and sentences.[6]


_____
                    Rebecca White Berch, Chief Justice


CONCURRING:


_____
Scott Bales, Vice Chief Justice


_____
A. John Pelander, Justice


_____
Robert M. Brutinel, Justice


_____
Samuel A. Thumma, Judge*


* Pursuant to Article 6, Section 3 of the Arizona Constitution, the Honorable Samuel A. Thumma, Judge of the Arizona Court of Appeals, Division One, was designated to sit in this matter.

_____

[6] Parker lists twenty-seven constitutional claims that he states this Court has previously rejected, but he seeks to preserve for federal review. We do not address those here.