NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA,
*Appellee*,

v.

GABRIEL JOSE RUBIO,
*Appellant*.

No. 1 CA-CR 19-0668
FILED 12-8-2020

Appeal from the Superior Court in Maricopa County
No.  CR2018-141975-001
The Honorable Jeanne M. Garcia, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Elizabeth T. Bingert
*Counsel for Appellee*

Maricopa County Public Defender's Office, Phoenix
By Paul J. Prato
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Presiding Judge James B. Morse Jr. delivered the decision of the Court, in which Judge Maria Elena Cruz and Judge Paul J. McMurdie joined.

---

**M O R S E**, Judge:

¶1   Gabriel Rubio ("Rubio") appeals his convictions and sentences for three counts of aggravated assault and one count of criminal damage. For the following reasons, we affirm.

### FACTS AND PROCEDURAL BACKGROUND

¶2   Rubio and M.A. were living together as friends in Rubio's apartment in August 2018. The two were drinking and watching television late at night on August 25 when they started fighting.

¶3   On August 26, 2018, a Maricopa County Grand Jury indicted Rubio on three counts of aggravated assault with a deadly weapon or dangerous instrument ("Counts 1−3"); one count of kidnapping ("Count 4"); one count of aggravated assault ("Count 5"); one count of threatening or intimidating ("Count 6"); once count of assault ("Count 7"); one count of preventing the use of a telephone in an emergency ("Count 8"); and one count of criminal damage ("Count 9").

¶4   During the trial in September 2019, M.A. testified that Rubio "gouged [her] eyes" with his thumbs, struck her multiple times in the head and face with a hammer, strangled her, threatened to kill her while putting a gun to her face, and damaged her cell phone by throwing it against a wall.

¶5   Rubio denied hitting M.A. with the hammer, threatening her with the gun, or choking her. Instead, he claimed that in response to an insult, M.A. became enraged, lunged at him, clawed his face and chest with her nails, kneed him in the groin, and pointed a gun and chased him out of the apartment. Rubio said he attempted to use M.A.'s cell phone to call her mother before M.A. grabbed the phone from his hand and threw it against the wall, damaging it.

¶6   Rubio's upstairs neighbor, James, testified that he called police at 1:14 a.m. after hearing loud "arguing," "crashing," "banging," and "fighting" from Rubio's apartment. James also said the apartment went

silent when officers knocked and announced themselves at Rubio's door. James called the police a second time at 2:28 a.m. after hearing "more banging," "a man and a woman both arguing loud," and "a woman screaming[.]"

¶7            M.A. testified that Rubio forced her to stay quiet inside of a closet when police first knocked. Rubio testified that M.A. pointed a gun at him and told him not to open the door to the police.

¶8            According to M.A., after the police left, Rubio flipped over furniture and threw "everything everywhere." She testified that Rubio dumped laundry detergent on the mattress and then left the apartment for about ten minutes before returning, grabbing some things, calling his mother, and leaving again. Rubio disputed M.A.'s account and testified that M.A. chased him out of the apartment with a gun after the police left.

¶9            A Tempe police officer responded to James' second 9-1-1 call and encountered M.A. outside of Rubio's apartment. The officer "noticed a large laceration underneath [M.A.'s] left eye," "large swelling on [the] right side of [her] face," and a red tint, "consistent with blood," on the neckline of her shirt. While awaiting paramedics, M.A. told the officer that Rubio caused her injuries.

¶10           Another officer testified that the inside of Rubio's apartment "was a complete disaster," with blood on the floor and walls, and DVDs, couch cushions, and broken glass scattered across the floor. On the bathroom floor, police found a hammer with blood on the handle and claw. They also found a loaded handgun[1] on top of a dresser and a smashed cell phone without its battery. Police did not submit the hammer or handgun for DNA testing. A detective testified that DNA testing would not have been helpful since Rubio and M.A. shared the residence, and DNA from both of them could have been on the hammer and handgun.

¶11           M.A. was taken to a hospital and treated by a physician's assistant. The physician's assistant observed that M.A. had black and blue swelling around both of her eyes, a laceration under her left cheek, and bruising on her arms.[2] M.A. testified that she received seven stitches to repair the laceration on her face, which she attributed to a blow from the

_____

[1]      Rubio testified that the gun belonged to him, although he also said he did not know who purchased the gun.

[2]      M.A. told the physician's assistant that a bruise under her left eye was old and not from that evening.

hammer. Rubio testified that he caused the injuries to M.A.'s face when he "grabbed her hands and made them into fists, and . . . pushed them into her face so [he] could get her off of [him] because . . . she had her knee between [his] legs and was crushing [his] . . . testicles."

¶12 A forensic nurse conducted a strangulation exam and documented forty-five injuries on M.A. Among the injuries were two contusions to M.A.'s head, recorded as an "eight centimeters by nine centimeter[s] area to the back of the head with dried blood, jagged edges, purple," and a "three centimeters by six centimeters area to the left side of the head. Multiple, linear, curvilinear, purple[.]" The nurse testified that M.A. told her, "[h]e hit me with the hammer."

¶13 Not long after M.A.'s discharge from the hospital, police spotted and arrested Rubio as he was walking toward his apartment. Police photographed Rubio during the booking process and documented scratches on Rubio's chest, back, and face.

¶14 Police executed a search warrant on Rubio's cell phone. Data extracted from the phone revealed that Rubio had sent several text messages to his mother during the early morning hours of August 26. Rubio also admitted that he had multiple phone calls with his mother and father during that time. A text message sent at 1:25 a.m. read: "The cops r here I'll wait till they leave[.]" Rubio's mother responded, "Papa's coming[,]" and Rubio replied, "Well don't come to the door till they leave[,]" "They're banging on the door[,]" and "Wait til they leave[.]"

¶15 Rubio again texted his mother at 2:03 a.m.: "The cops r waiting[.]" At 2:14 a.m., his mother texted that Rubio's father was at a gas station, "[w]aiting on what to do[.]" At 2:43 a.m., Rubio texted: "I'm with papa[.]" Rubio then sent two more text messages to his mother: "But she called you a whore and a hoe thats why I got maf";[3] and "called papa a bitch ass beaner[.]" At 4:25 a.m., Rubio texted his mother not to open the door for police. Rubio testified that he did not use his car to drive himself away from his apartment because he had been drinking.

¶16 The trial court denied Rubio's Rule 20 motion for a directed verdict. Over Rubio's objection, the court instructed the jury that it "may consider any evidence of the defendant's hiding, or concealing evidence,"

---

[3] At trial, the parties disputed whether "maf" was simply a typo for "mad" or an acronym for "mad as f- - -." Rubio testified that it was a typo.

and "may also consider the defendant's reasons for hiding, or concealing evidence."

¶17        The jury found Rubio guilty as charged.  The court sentenced Rubio to concurrent terms of ten years in prison for Counts 1−3, three years in prison for Count 5, six months in jail for Counts 6 and 7, and four months in jail for Counts 8 and 9.  The court placed Rubio on three years of supervised probation for Count 4, to begin upon his release from prison.

¶18        Rubio timely appealed.  We have jurisdiction under Article 6, Section 9, of the Arizona Constitution, and A.R.S. §§ 12-120.21(A)(1), 13-4031 and -4033(A)(1).

## DISCUSSION

### I.        Sufficiency of the Evidence.

¶19        Rubio claims the evidence was insufficient to support his convictions for aggravated assault with a deadly weapon or dangerous instrument (Counts 1−3) and criminal damage (Count 9).  We review the sufficiency of the evidence "only to determine whether substantial evidence supports the jury's verdict, 'viewing the facts in the light most favorable to sustaining the jury verdict.'"  *State v. Cox*, 217 Ariz. 353, 357, ¶ 22 (2007) (quoting *State v. Roque*, 213 Ariz. 193, 218, ¶ 93 (2006), *abrogated on other grounds by State v. Escalante-Orozco*, 241 Ariz. 254 (2017)).  The critical inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  Because the jury is presumed to follow instructions, "all reasonable inferences will be resolved against a defendant."  *State v. Lee*, 189 Ariz. 608, 615 (1997).

¶20        For the aggravated assault with a deadly weapon or dangerous instrument counts, the State was required to prove that Rubio injured M.A. with a dangerous instrument, the hammer (Counts 1 and 2); and placed M.A. in reasonable apprehension of imminent physical injury with a deadly weapon, the gun (Count 3).  For the criminal damage count, the State was required to prove that Rubio recklessly defaced or damaged M.A.'s cell phone.

¶21        Rubio argues that no rational trier of fact could have found beyond a reasonable doubt that he damaged M.A.'s cell phone or that he used the hammer and the gun to assault M.A.  He characterizes the case as a "he said, she said evidentiary conflict" that the jury could have only

resolved by speculation and guessing. Rubio points to the absence of DNA testing and third-party eyewitnesses as further proof that the evidence was insufficient to support his convictions.

**¶22** However, contrary to Rubio's claims, "[e]vidence is not insubstantial simply because the testimony is conflicting or reasonable persons may draw different conclusions from the evidence." *State v. Ballinger*, 110 Ariz. 422, 425 (1974). M.A.'s testimony, standing alone, is sufficient to sustain the convictions. *See State v. Munoz*, 114 Ariz. 466, 469 (App. 1976) ("[A] conviction may be based on the uncorroborated testimony of the victim unless the story is physically impossible or so incredible that no reasonable person could believe it."); *see also State v. Merryman*, 79 Ariz. 73, 75 (1955) (rejecting argument that uncorroborated victim testimony was insufficient to sustain a conviction). Thus, even though Rubio disputed M.A.'s account, the verdict indicates the jury found M.A.'s testimony more credible than Rubio's. *Cox*, 217 Ariz. at 357, ¶ 27 ("[T]he credibility of the witnesses and the weight of the value to be given to their testimony are questions exclusively for the jury." (citation omitted)).

**¶23** But even if corroboration were required, the record contains significant evidence consistent with M.A.'s account of events. M.A.'s injuries required emergency medical treatment, and the jury heard descriptions and viewed photographs of the extent and severity of those injuries. Rubio admitted causing M.A.'s injuries—though he claimed they were inflicted while "trying to protect" himself. Police recovered a bloody hammer, a loaded handgun, and a broken cell phone from inside the apartment. Thus, although police did not pursue DNA testing, other circumstantial evidence corroborated M.A.'s testimony.

**¶24** Rubio also speculates that showing the jury photographs of M.A.'s facial injuries may have caused the jury members to disregard the presumption of innocence.[4] However, the trial court instructed the jury that it "must start with the presumption that the defendant is innocent[,]" that it "should not guess about any fact[,]" and that it "must not be influenced by sympathy or prejudice." Jurors are presumed to follow a court's instructions. *State v. Morris*, 215 Ariz. 324, 337, ¶ 55 (2007). Rubio's speculation is therefore unavailing.

---

[4] Rubio did not object to admission of the photographs as evidence at trial, and does not claim on appeal that the trial court erred by admitting the photographs.

## II.     Commenting on Evidence.

**¶25**         Rubio argues the evidentiary record did not support a reasonable inference that he hid or concealed evidence, and thus, the trial court commented on evidence when it provided the jury with a flight instruction. *See* Ariz. Const. art. 6, § 27 ("Judges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law.").

**¶26**         Rubio objected to the trial court's decision to give the jury a "flight or concealment" instruction, arguing there was no evidence that he physically ran away from the crime scene or concealed evidence.  We review a trial court's decision to give an instruction, over objection, for an abuse of discretion, *State v. Dann*, 220 Ariz. 351, 363-64, ¶ 51 (2009), but we review constitutional issues de novo, *State v. Pandeli*, 242 Ariz. 175, 180, ¶ 4 (2017).

**¶27**         If supported by the evidence, the flight instruction is not an improper comment on the evidence under Article 6, Section 27, of the Arizona Constitution.  *State v. Celaya*, 135 Ariz. 248, 256 (1983) (citing *State v. Hatton*, 116 Ariz. 142 (1977)).  Arizona courts utilize a two-part test to determine whether the evidence warrants a flight instruction. *State v. Smith*, 113 Ariz. 298, 300 (1976).  First, we ask whether the evidence "supports a reasonable inference that the flight or attempted flight was open, such as the result of an immediate pursuit." *Id.*  If there is no evidence of open flight, the instruction is appropriate only if the evidence "support[s] the inference that the accused utilized the element of concealment or attempted concealment." *Id.*  A court may give a flight instruction "if the state presents evidence from which jurors may infer 'consciousness of guilt for the crime charged.'" *State v. Parker*, 231 Ariz. 391, 403, ¶ 44 (2013) (quoting *State v. Edwards*, 136 Ariz. 177, 184 (1983)).

**¶28**         Rubio argues the evidence did not support a reasonable inference that he hid or concealed the hammer, handgun, or M.A.'s damaged cell phone.  However, the State never alleged Rubio attempted to conceal evidence.  Instead, the State argued Rubio's failure to open the door to the police, his text messages asking his parents not to come to or open the door, and his departure from the crime scene all warranted the instruction.

**¶29**         We find sufficient evidence in the record to support a reasonable inference that Rubio concealed himself from police during the early hours of August 26. *See Smith*, 113 Ariz. at 300.  M.A. testified that Rubio forced her to stay quiet inside a closet and prevented her from

responding when the police knocked. Although Rubio disputed M.A.'s account, the conflicting testimony "goes to the weight of the flight evidence; it does not preclude the trial court from giving a flight instruction." *See Parker*, 231 Ariz. at 404, ¶ 46.

**¶30** The text messages Rubio sent to his mother further indicate a deliberate attempt to avoid contact with the police. When the police came to his door the first time, Rubio texted his Mother: "The cops r here I'll wait till they leave[.]" When Rubio's mother texted "Papa's coming[,]" Rubio responded: "Well don't come to the door till they leave"; "Wait til they leave"; and "The cops r waiting[.]" Once police left the apartment, Rubio went to be picked up by his father at a gas station. Rubio again texted his mother at 4:25 a.m. to not open the door for police.

**¶31** Evidence of Rubio's attempt to prevent M.A. from answering the police, his effort to avoid police both before and after leaving the scene of the crime, and the request to his mother that she not open the door for police is "evidence from which jurors may infer 'consciousness of guilt for the crime charged.'" *See id.* at 403-04, ¶¶ 44-50 (quoting *Edwards*, 136 Ariz. at 184) (approving flight instruction where the defendant fled the state and failed to contact authorities when told police were looking for him, even though police were not pursuing him). Therefore, the trial court did not abuse its discretion in providing the jury with the flight instruction. *Id.* Because there was sufficient evidence to support the instruction, the trial court did not improperly comment on the evidence. *Celaya*, 135 Ariz. at 256.

## CONCLUSION

**¶32** We affirm Rubio's convictions and sentences.



AMY M. WOOD • Clerk of the Court
FILED:     AA