NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

ANTHONY EUGENE MOORE, *Appellant.*

No. 1 CA-CR 15-0589
FILED 1-5-2017

Appeal from the Superior Court in Maricopa County
No.  CR2013-001962-001 DT
The Honorable Pamela S. Gates, Judge

**AFFIRMED AS MODIFIED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Michael F. Valenzuela
*Counsel for Appellee*

Maricopa County Public Defender's Office, Phoenix
By Carlos D. Carrion
*Counsel for Appellant*

## MEMORANDUM DECISION

Judge Paul J. McMurdie delivered the decision of the Court, in which Presiding Judge Diane M. Johnsen and Judge Jon W. Thompson joined.

**M c M U R D I E**, Judge:

¶1 Anthony Eugene Moore appeals his convictions and sentences for kidnapping, aggravated assault, burglary in the first degree, and sexual assault, all dangerous offenses, arising from a sexual assault at gunpoint.

### FACTS AND PROCEDURAL BACKGROUND

¶2 The evidence at trial demonstrated that while the 20-year-old victim was walking home at about 10 p.m. on a Sunday night in February 2009, a man came up from behind her, and forced her at gunpoint to walk with him to the backyard of a vacant house and perform oral sex on him. [1]

¶3 DNA on a swab taken from the outside of the victim's mouth the night of the incident was matched to Moore's DNA three years after the assault.

¶4 At trial, Moore acknowledged he and the victim went to the backyard of a vacant house where she performed a sex act on him, but he testified that the sex was consensual. He testified he had met the victim on a chat line, and after exchanging calls for about a week, they arranged to meet that night. Moore admitted he had three prior felony convictions.

¶5 The jury convicted Moore of kidnapping, aggravated assault, burglary in the first degree, and sexual assault, and found that the offenses involved the use of a deadly weapon. The court found the existence of one historical dangerous prior felony conviction, and sentenced Moore to a total of 20 years in prison, to be served consecutively to prison terms imposed in four other cases.

---

[1] We view the evidence on appeal in the light most favorable to sustaining the convictions. *State v. Boozer*, 221 Ariz. 601, 601, ¶ 2 (App. 2009).

## DISCUSSION

### A.    Admission of Expert Testimony.

¶6          Moore argues that the court abused its discretion in admitting the testimony of Melissa Brickhouse-Thomas as a "blind" or "cold" expert on the behavior and memories of victims of sexual violence, because the testimony failed to meet the standards in Arizona Rule of Evidence 702.

¶7          Rule 702 provides that a witness "qualified as an expert by knowledge, skill, experience, training, or education" may testify as to her opinion if: "a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;  b) the testimony is based on sufficient facts or data; c) the testimony is the product of reliable principles and methods; and d) the expert has reliably applied the principles and methods to the facts of the case." Ariz. R. Evid. 702. Our supreme court has held that subsection (d) is not applicable in evaluating the admissibility of the testimony of a cold expert. *State v. Salazar-Mercado*, 234 Ariz. 590, 593, ¶ 11 (2014). We review a "trial court's ruling on the admissibility of expert testimony for an abuse of discretion, viewing the evidence in the light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect." *State v. Ortiz*, 238 Ariz. 329, 333, ¶ 5 (App. 2015) (citations and internal punctuation omitted).

¶8          Brickhouse-Thomas testified at a Rule 702 hearing that she had a master's degree in social work, was a licensed clinical social worker, and had worked 18 years as a social worker, including 10 years as an emergency-room social worker at St. Joseph's Hospital.   She also worked on the crisis intervention response team of the Phoenix Police Department and in a residential treatment center with adolescent girls with histories of sexual violence.  At the time of trial, she had worked nearly nine years at the Glendale Police Department, where she was a supervisor of the Victim Assistan[ce] Unit. She based her opinions on her training and education, as well as her experience treating approximately 250–300 victims of sexual violence over the course of her career.

¶9          Brickhouse-Thomas told the court that she anticipated she would testify "about victim behavior in the context of sexual violence. More specifically, why a victim may or may not react in the way somebody would expect them to react after an act of sexual violence . . . and the impact of trauma . . . on memory and how traumatic memories are different from everyday memories."

¶10 The court found that "this witness' specialized knowledge will assist the trier of fact in understanding the evidence or to determine a fact in issue specifically to understand the general behavioral patterns of victims to help them understand the evidence and the reactions, including but not limited to delayed reporting or inconsistent reporting." The court further found that "her testimony is based on sufficient facts, training and experience, that the testimony is a product of sufficiently reliable methods, and so the Court does find, pursuant to Rule 702, and consistent with *Salazar* . . . this testimony is admissible." The court, however, found that the expert did not have sufficient education or training to opine about the neurobiological aspects of processing and storing memories in the brain.

¶11 Moore argues first that the court abused its discretion in finding that the expert testimony would "assist the trier of fact to understand the evidence or to determine a fact in issue" under Rule 702(a) because (1) the expert's opinions about victim behavior were so broad and vague to be of no help to the jury; (2) the prospective jurors' responses during *voir dire* demonstrated that they needed no help in evaluating the victim's conduct, because "no jurors held any belief that a real victim had to recall things perfectly, or in the exact same manner each time, or had to fight her attacker"; and (3) the expert's opinions were irrelevant because they were based on observations of supposed victims whom the expert could not say with certainty were in fact telling the truth.

¶12 The court acted well within its discretion in finding that the expert's testimony was relevant and would be of help to the jury. "When the facts of the case raise questions of credibility or accuracy that might not be explained by experiences common to jurors—like the reactions of child victims of sexual abuse—expert testimony on the general behavioral characteristics of such victims should be admitted." *State v. Lujan*, 192 Ariz. 448, 452, ¶ 12 (1998). This was such a case, even though the victim was 20 years old at the time of the assault. The victim acknowledged at trial that she did not scream or try to flee; did not call police afterward, but instead called her boyfriend, with whom she had just had a fight; told inconsistent stories about what had happened; gave multiple descriptions of the person who assaulted her; and failed to cooperate with police requests for follow-up interviews. The expert's testimony was helpful to understand the victim's reactions to and after the assault, and to evaluate her credibility, and was not so "broad and vague" as to be of no help. The expert testified that victims of sexual assault may freeze from fear instead of scream and run; recall the experience in a snapshot or fragmented way; disclose the incident in different ways at different times; delay reporting or fail to cooperate with police because of fear, shame, or embarrassment; blame

themselves for choices they made that might have contributed to what happened to them; and experience secondary consequences such as anxiety or depression. The expert's caveat that "[a]ll victims do not behave the same way" did not rob the opinion of helpfulness; rather, it simply offered evidence that some expected reactions might be true of one victim but not another. *See Salazar–Mercado*, 234 Ariz. at 594, ¶ 15 ("cold expert" testimony satisfied Rule 702(a) because it "might have helped the jury to understand possible reasons for the delayed and inconsistent reporting" by sexual abuse victims).

¶13　　　Nor did the court abuse its discretion in finding that the expert testimony would be helpful notwithstanding the jurors' responses during *voir dire* and the expert's testimony that she could not be certain that the persons she treated were telling the truth. The questions during *voir dire* were designed to determine biases that would impair the jurors' ability to be fair, *see* Ariz. R. Crim. P. 18.5(d) and (e), not to determine whether expert testimony on how a victim of sexual assault might react would be helpful to the jurors, and the court acted well within its discretion in finding the expert testimony would be helpful to the jury despite prospective jurors' responses during *voir dire*. Finally, the expert's opinions were not irrelevant simply because she could not say with certainty that the victims she treated were "being 100 percent truthful." As the court appropriately found, whether the expert could verify that the victims she treated were telling the truth was an appropriate topic for cross-examination and not a bar to admissibility. *See State v. Delgado*, 232 Ariz. 182, 187, ¶ 15 (App. 2013) (whether an expert's patients have accurately reported the cause of their injuries goes to the weight of the expert's testimony, not its admissibility).

¶14　　　The court also did not abuse its discretion in finding that this expert's opinions were "based on sufficient facts or data" under Rule 702(b) and were "the product of reliable principles and methods" under Rule 702(c).　The expert's master's degree in social work, her continuing education and training, and her experience of more than 18 years treating victims were more than sufficient to allow the court to find that her opinions were reliable and based on sufficient facts and data.

¶15　　　Moore argues that this expert had never undertaken clinical or behavioral research, nor read "the original literature in her field," and thus was barred from testifying under Rule 702(b) and (c). Even assuming *arguendo* that these assertions are correct, these ostensible deficits would not necessarily bar her testimony. Rule 702 does not disallow the testimony of experts who are not scientists, and a court has broad latitude in determining which factors are reasonable measures of reliability in a particular case.

5

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 153 (1999); *see also* Ariz. R. Evid. 702 cmt. to 2012 amend. (amendment not intended to "preclude the testimony of experience-based experts"). Because "the social stigma attached to rape may preclude ideal experimental conditions and controls," courts may allow expert testimony on conduct of sexual assault victims based on the experts' professional experience, education, training, and observations. *See United States v. Simmons*, 470 F.3d 1115, 1123 (5th Cir. 2006); *United States v. Bighead*, 128 F.3d 1329, 1330 (9th Cir. 1997) (rejecting the argument that a child-sex-abuse expert was unreliable because the court had not determined whether the expert's "theories could be tested, were subject to peer review and publication, had the potential for error, and were generally accepted in the field.").

¶16        Moore also claims the expert's specialized knowledge was not based on sufficient facts or data because it was based in part on information and "best practice recommendations" from professional organizations, which constituted hearsay. It is permissible, however, for a testifying expert to rely on the facts, data, or opinions supplied by others if this "is the kind of material on which experts in the field base their opinions." *State v. Lundstrom*, 161 Ariz. 141, 147 (1989) (citation omitted). Brickhouse-Thomas testified that it was standard practice in her field to rely on the information and "best practice recommendations" from professional organizations. The record further fails to show that this expert was impermissibly acting simply as a conduit for the opinions of the experts who prepared this training material. *See Lundstrom*, 161 Ariz. at 148. Rather, she testified that her opinions were based not only on her training, but also her education and her experience treating victims.

¶17        Finally, the court did not abuse its discretion in finding that the expert's testimony was not cumulative to the "very limited" testimony offered by the investigating detective on victim behavior, and in failing to find that the relevance of the testimony was substantially outweighed by any unfair prejudice. *See* Ariz. R. Evid. 403. "Deciding whether expert testimony will aid the jury and balancing the usefulness of expert testimony against the danger of unfair prejudice are generally fact-bound inquiries uniquely within the competence of the trial court." *State v. Moran*, 151 Ariz. 378, 381 (1986). The record supports the court's ruling, and provides no basis to find an abuse of discretion on this ground.

¶18        Moreover, the court instructed the jury that "[e]xpert opinion testimony should be judged just as any other testimony," and the jurors "should give it as much credibility and weight as you think it deserves considering the witness's qualifications and experience, the reasons given

for the opinions and all the other evidence in the case." The jury is presumed to have followed this instruction. *State v. Newell*, 212 Ariz. 389, 403, ¶ 68 (2006). For all of these reasons, the court did not err in allowing Brickhouse-Thomas to offer her expert opinions at trial.

### B. Opinions on Percentage of Victims Who Made False Allegations.

**¶19** Moore argues that the state improperly introduced testimony from its expert and investigating detective on the percentage of purported victims who fabricate allegations. Additionally, Moore argues that the prosecutor improperly argued the percentage-based testimony during closing arguments. Because Moore did not object at trial, we review for fundamental error only. *See State v. Henderson*, 210 Ariz. 561, 568, ¶ 22 (2005). On fundamental error review, a defendant has the burden of proving that an error occurred, that the error was fundamental in nature, and that the defendant was prejudiced thereby. *Henderson*, 210 Ariz. at 567, ¶ 20. However, "if an error is invited, we do not consider whether the alleged error is fundamental," and we will not find reversible error. *State v. Logan*, 200 Ariz. 564, 565–66, ¶ 9 (2001).

**¶20** On cross–examination, Detective Jansen testified that she could sometimes tell when a purported victim was lying, and described some behavioral cues that alerted her to lies. On re-direct, without objection, the detective testified that the "majority of the false allegations were from teenage girls." Over foundation and speculation objections, the detective was permitted to respond to the prosecutor's question: "And based upon those investigations, how many, out of the 500 to 550 that you investigated, were you able to say you could verify were false allegations?" The detective responded, "Your Honor, I don't know that I can give a precise number on it. But I would have to say that's a very small amount – anywhere under ten – of those cases."[2]

**¶21** On cross-examination, Brickhouse-Thomas testified that she did not directly ask the victims if they were lying, but did factor whether they were telling the truth into her treatment. The expert testified in response to defense counsel's question, "[s]o . . . you are unaware of the actual number of people that you dealt with who are actual victims as opposed to people who are false accusers?": "Correct. I have never counted them." On re-direct, over Moore's objection on foundation and speculation

---

[2] The court struck the portion of the detective's answer following the word "cases," specifically, "where I was able to say that they were false."

grounds, Brickhouse-Thomas testified that in her training and experience, sexual assault is under reported. A juror then posed the follow-up question: "In your experience, how many victims have you worked with who have eventually been discovered as false accusers?" Defense counsel had no objection with the proviso, "[a]s long as she has sufficient knowledge." Brickhouse-Thomas responded: "Again, that's difficult because I don't always track that. But based on my experience over, you know, the 18 years, maybe 3 percent, 5 percent, that I become aware of . . . I'm comfortable saying a very low percentage, 3 to maybe 5 percent."

¶22        We find the challenged testimony from both the detective and Brickhouse-Thomas to be invited error. During direct examination, neither witness was asked about false reporting or the veracity of an average victims' claims. But on cross-examination, Moore asked both witnesses about false accusers in relation to the total number of cases they had previously handled. Moore asked Brickhouse-Thomas specifically if she knew "the actual number of people" who were false accusers. On cross-examination Detective Jansen was asked if any of the 500 to 550 cases she had investigated involved false allegations. Moore argues he never directly asked the witnesses to quantify the false allegations, but based on his line of questioning the percentage-based questions asked on redirect naturally flowed from Moore's cross-examination. The cross-examination of Brickhouse-Thomas even prompted the jury to ask a quantifying question, to which Moore did not object, about false accusers. Accordingly, we find the source of the percentage-based testimony to be the Defendant, and therefore invited error. *See Logan*, 200 Ariz. at 633, ¶ 11 ("The purpose of the [invited error] doctrine is to prevent a party from injecting error in the record and then profiting from it on appeal.") (quotation omitted).

¶23        However, the statements made by the prosecutor in closing argument related to both the expert and the detective's testimony about the percentage of cases in which they discovered that a victim had made a false accusation were a violation of the principle set forth in *State v. Lindsey*, 149 Ariz. 472 (1986). It has long been settled that an expert is precluded from offering opinions "with respect to the accuracy, reliability or truthfulness of witnesses of the type under consideration," *see Lindsey*, 149 Ariz. at 475, or quantifying "the percentage of victims who are truthful in their initial reports despite subsequent recantation." *Moran*, 151 Ariz. at 382. The prosecution's arguments that "[f]alse allegations of rape are rare," and "Ms. Thomas told you that it is about three to five percent, and . . . right in line with Detective Jansen's testimony . . . [that it is] almost two percent" inappropriately drew the conclusion for the jurors that the current witness, the victim, was telling the truth based on the reliability of past victims.

Because Moore did not object to the prosecution's inappropriate argument, we review only for fundamental error. *Id.*

**¶24**      Moore has failed to meet his burden to show that the error was both fundamental and prejudicial. Error is fundamental when it goes to the foundation of the defendant's case, takes from him a right essential to his defense, and is error of such magnitude that he could not possibly have received a fair trial. *Henderson*, 210 Ariz. at 567, ¶ 19. To prove prejudice, a defendant must show that a reasonable jury could have reached a different result absent the error. *Henderson*, 210 Ariz. at 569, ¶ 27. Moore's defense was that the sexual encounter with the victim was consensual, as the two had met on a sex-chat line. Moore argued that his consensual theory was bolstered by the alleged victim's behavior after the assault, her failure to fight back or scream, her inconsistent descriptions of her assailant and the assault, and the absence of physical injuries or other evidence consistent with an assault. Moore's defense was severely hampered by the fact that he denied meeting the victim when first asked about the attack, and the evidence surrounding the alleged encounter evidenced an assault. The statements in closing argument by the prosecutor that the detective and expert had discovered or verified that very few of the victims they had encountered had made false allegations did not go to the foundation of Moore's case, take from him a right essential to his defense, or constitute error of such magnitude that he could not possibly have received a fair trial. Nor has Moore shown that a reasonable jury could have reached a different result absent the error, as necessary to show prejudice. Moore has accordingly failed to meet his burden on fundamental error review.

### C.    Right to a Speedy Trial.

**¶25**      Moore argues that the state violated his Sixth Amendment right to a speedy trial because 11 months passed between his indictment and his arraignment, and he was prejudiced because he was unable to locate two witnesses who saw him and the victim together at their apartment that night, known to him only as Jason and Blanca.

**¶26**      Moore was incarcerated on other charges during the 11 months between his indictment and arraignment. Six months after his arraignment, Moore filed a Motion to Dismiss for Post-Indictment Delay, arguing that the delay was caused by the state's negligence, and he had suffered prejudice because in that one year several witnesses have disappeared. He told the court that the witnesses about whom he was speaking were not alibi witnesses, but were "with both Mr. Moore and the alleged victim prior to the incident."

¶27 The court denied the motion without prejudice on the ground it was premature, noting, however, that "if you have something more substantial by way of actual prejudice and efforts of locating the witnesses . . . then maybe we will have something a bit more solid to go on, but at this point in time the Motion to Dismiss is denied." Moore did not raise the issue again.

¶28 "We review issues of constitutional law de novo, and related factual determinations for abuse of discretion." *State v. Parker*, 231 Ariz. 391, 398, ¶ 8 (2013). The Sixth Amendment right to a speedy trial does not "provide a specific time limit within which trial must be held." *State v. Henry*, 176 Ariz. 569, 578–79 (1993). In evaluating such claims, we weigh (1) the length of the delay; (2) reasons for the delay; (3) defendant's assertion of the right; and (4) the resulting prejudice. *Parker,* 231 Ariz. at 398, ¶ 9 (citing *Barker v. Wingo*, 407 U.S. 514, 530–33 (1972)). In weighing these factors, prejudice to a defendant is the most significant factor. *Parker,* 231 Ariz. at 399, ¶ 16.

¶29 As the pre-trial delay approaches one year, the delay is considered "presumptively prejudicial," that is, unreasonable enough to trigger a speedy trial analysis. *See Doggett v. United States*, 505 U.S. 647, 652 n.1 (1992). "If the accused makes this showing, the court must then consider, as one factor among several, the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim." *See Doggett*, 505 U.S. at 652.

¶30 As an initial matter, the Sixth Amendment right to a speedy trial does not attach until a defendant is accused, in this case when Moore was indicted. *See United States v. Marion*, 404 U.S. 307, 313 (1971); *State v. Williams*, 183 Ariz. 368, 379 (1995). "Thus, in terms of the Sixth Amendment, the pre-indictment delay is of no consequence." *Williams*, 183 Ariz. at 379. Moore's reference to the crime having occurred "four years before the indictment and five years before [he] was actually served" accordingly is to no avail; the only relevant period is the 11-month delay between indictment and arraignment. *See id.*

¶31 The record fails to show that the 11-month delay in arraigning Moore violated his right to a speedy trial. The 11-month delay in this case arguably was sufficient to trigger the *Barker* analysis. *See Doggett*, 505 U.S. at 652 n.1. The length of the delay, however, barely met the minimum needed to trigger the analysis, and thus the first factor—the length of the delay—does not weigh in favor of Moore. *See Doggett*, 505 U.S. at 652. The second factor — a determination of who was responsible for the delay —

weighs against the state, although not heavily, because the record shows that the state negligently, but not intentionally, caused the delay. *See Barker*, 407 U.S. at 531 (a deliberate attempt to delay trial in order to hamper defense weighs heavily against the state; negligence weighs less heavily against the state). The third factor — defendant's assertion of his right — weighs against Moore. He first failed to assert his speedy trial rights until six months after he was arraigned, several months after he successfully moved to have the case designated as complex, and only a few months before the date he had requested trial be set. He then failed to heed the court's invitation to refile his speedy trial motion with more support for his claim of prejudice.

¶32 The final and most important factor — prejudice from the delay — also does not weigh in favor of Moore. Moore argues that the "courts have found that prejudice should be presumed when the state has caused the delay." The length of the state-caused delay in this case, however, was not so long as to obviate the need for a showing of actual prejudice. *See Doggett*, 505 U.S. at 657 ("[O]ur toleration of such negligence varies inversely with its protractedness"; holding that a delay of 8.5 years between indictment and arrest obviated need to prove actual prejudice); *Parker*, 231 Ariz. at 399, ¶¶ 17–18 (rejecting claim that appellant did not need to show prejudice from four-year delay).

¶33 Moore also argues that the delay in arraigning him on the charges actually prejudiced him because during this time he lost his memory of, and opportunity to locate, two witnesses — apartment dwellers whom he knew only as Jason and Blanca — who could have testified they met him and the victim earlier that night in February 2009. Moore's claim of actual prejudice fails because it is purely speculative. He has not shown that, absent the delay between April 2013 and March 2014, he would have been able to locate these witnesses, whom he knew by first name only, and that they could have testified about meeting the victim with Moore that night in February 2009. *See United States v. Loud Hawk*, 474 U.S. 302, 315 (1986) ("That possibility of prejudice is not sufficient to support respondents' position that their speedy trial rights were violated.")

¶34 Weighing all of these factors, Moore's claim of a Sixth Amendment speedy trial violation fails.

### D. Absence of Aggravator on Count 3.

¶35 Finally, Moore asks this court to correct the minute entry that incorrectly shows the jury found harm to the victim as an aggravating

circumstance on Count 3. This court may correct a clerical error when the record is clear. *State v. Ovante*, 231 Ariz. 180, 188, ¶¶ 38–39 (2013). As the state concedes, the record is clear that the jury did not find harm to the victim as an aggravating circumstance on Count 3. The minute entry dated May 13, 2015, incorrectly shows that the jury found that the offense in Count 3 caused physical, emotional, or financial harm to the victim. We accordingly order the minute entry corrected to delete this sentence. *See Ovante*, 231 Ariz. at 188, ¶¶ 38–39.

## CONCLUSION

¶36 For the foregoing reasons we affirm Moore's convictions and sentences, but correct the minute entry dated May 13, 2015, to reflect that the jury did not find the offense in Count 3 caused physical, emotional, or financial harm to the victim.



AMY M. WOOD • Clerk of the Court
FILED: AA

12