NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

FREDDIS WILLIAMS, *Appellant*.

No. 1 CA-CR 18-0148
FILED 7-18-2019

Appeal from the Superior Court in Maricopa County
No. CR2017-109768-001
The Honorable Bradley H. Astrowsky, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Jana Zinman
*Counsel for Appellee*

The Stavris Law Firm, PLLC, Scottsdale
By Christopher Stavris
*Counsel for Appellant*

**MEMORANDUM DECISION**

Judge James B. Morse Jr. delivered the decision of the Court, in which Presiding Judge Jennifer B. Campbell and Judge Maria Elena Cruz joined.

**M O R S E**, Judge:

¶1 Freddis Williams appeals his conviction and sentence for second-degree murder. Because substantial evidence supports the verdict and the jury was properly instructed, we affirm.

**FACTS AND PROCEDURAL HISTORY**

¶2 On August 18, 2016, between 10:00 a.m. and 11:00 a.m., two witnesses drove to a fitness center. When they arrived in the fitness center parking lot, they noticed an 84-year-old man, S.H., sitting in his black car with the front and back driver's side doors open. S.H. did not move for two to three minutes, and his head and shoulders were hunched forward. The witnesses approached S.H. and asked twice if he needed help, but he was nonresponsive. A third witness arrived and all three then approached S.H. and saw that his "face just looked white" and he "didn't look right." They asked, again, if he was okay, but S.H. was still unresponsive.

¶3 One witness called 9-1-1 and another went inside the fitness center and told the manager about S.H. The manager went outside to the parking lot and saw S.H. in his vehicle, with "his hands crossed on his lap, and he was slumped over." The manager recognized S.H. because he frequented the fitness center. The police arrived and one of the officers began to perform CPR after he observed that S.H. was pale, nonresponsive, and not breathing, but stopped when he felt S.H.'s ribs cracking. He then noticed blood on S.H.'s shirt and near his waist. He cut his shirt off and saw two stab wounds on S.H.'s chest, "oozing" blood. The ambulance arrived and took S.H. to the hospital where he was pronounced dead. The cause of death was multiple stab wounds to the chest.

¶4 Meanwhile, around 9:30 a.m. that morning, a neighbor to the fitness center went outside to take her trash out. While outside, she heard "two loud screams, very loud" come from a man in the direction of the fitness center. The screams sounded "[v]ery frightened," and after she heard the screams, she heard "three hits" as though "somebody was hitting

something with a bat." She then heard "when the weapon was dropped to the ground" because it made a "metal sound." About fifteen minutes later, the neighbor took a ladder to the alley behind her home, which shared a wall with the fitness center, and looked over the wall. The neighbor saw a black car and a "body laying down" in the driver's front seat, with legs pointing out of the car. Two detectives later confirmed that the crime scene at the fitness center parking lot "was visible from [the neighbor's] vantage point."

¶5        A forensic scientist conducted DNA analysis from samples obtained from S.H.'s vehicle. Aside from S.H., bystanders at the crime scene, and S.H.'s family members, Williams was the only other DNA match found. Williams's DNA matched two swabs taken from the interior driver's side door of S.H.'s vehicle. Williams's left ring-finger fingerprint was also found on the exterior front driver's side door.

¶6        After identifying Williams's fingerprint, police located Williams, and a Chandler Police Department detective (the "Detective") interviewed him. During the interview, Williams stated that he did not recognize S.H., and denied ever seeing him. However, Williams admitted that he was in the fitness center parking lot for about 30 to 60 minutes, but claimed it was because he had car troubles. Williams gave inconsistent explanations to the Detective for his car troubles. He also stated four times throughout his interview that he "did not talk to anybody in the parking lot" nor "encounter or interact with anybody."

¶7        Police obtained data from Williams's cell phone, which showed Williams was in the area of the fitness center around the same time S.H. was stabbed. The data showed that his phone connected to various cell phone towers located around the fitness center, and that he used his cell phone in that area at 8:18 a.m., 8:32 a.m., 8:36 a.m., 8:37 a.m., and 8:56 a.m. There was no cell phone activity on Williams's phone between 8:56 a.m. and 9:48 a.m., and then his phone only made one more contact with a cell tower in Phoenix—not located near the fitness center—at 2:11 p.m. After the considerable cell phone activity around the fitness center the morning of August 18th, there was no cell phone activity for approximately 33 hours— between 2:11 p.m. on August 18 in Phoenix until 11:00 p.m. on August 19 near Williams's home in Chandler. The data from the cell phone also showed that Williams's presence near the fitness center was not a "part of [Williams's] normal habit or normal pattern of life."

¶8 During trial, Williams testified that he interacted with S.H. in the fitness center parking lot. Williams stated that he was having car trouble when a black car, driven by S.H., pulled into the parking lot and parked near him. Williams testified that S.H. was standing outside of his car, said good morning to him, asked if he was having car troubles, and invited Williams to "cool off under the air conditioning" in S.H.'s vehicle while he waited for his car to start again. Williams said "sure," opened the front driver's side door, pressed the unlock button for the back door, and sat in the backseat of S.H.'s vehicle. Williams claimed that S.H. then joined him in the car, and after conversing for about five to ten minutes, Williams got out of the car and was able to start his car again on the first try. Williams testified that S.H. told him that he hoped that everything would work out for him and then S.H. "pulled out and went towards the [fitness center] building." After S.H. drove away, Williams claimed that "a man, Hispanic guy with tattoos" asked Williams if he had a cigarette. Williams testified that he told the man that he did have cigarettes in the driver's side door and asked the man to "push the gas to keep the car idling." The man did so, grabbed a couple of cigarettes, left, and then Williams drove away.

¶9 Williams testified that he initially lied to the police about being in contact with S.H. at the fitness center because

> it all hit me like in a trauma state of mind. First of all, I thought why would someone do this to this man. Second of all was if I was there, I could have helped him but in harm's way as well; or third, was it—did that guy that I offered cigarettes to take my mail of any sort, was I being targeted if I told them the truth . . . .

Williams conceded that he did not tell the Detective about the "Hispanic guy" nor did he ever call the police station to give them information about his interaction with him.

¶10 Williams further testified that after he left the fitness center parking lot, he drove to a mechanic who he "[has] a relationship with" and has known since he was 17 years old. When asked the name of the mechanic shop, however, Williams stated that he was "not sure what the name of the shop [was]" nor did he know the name of the mechanic whom he claimed to have known since childhood. Williams testified that after he left the mechanic shop, he drove to Tucson that afternoon to see his father. Williams stated that his trip to Tucson was prearranged and even though it was his wife's birthday, she was aware that he was going. Both his wife and father testified, however, that Williams's trip was unexpected and they

4

were unaware that he planned to drive to Tucson. Williams's wife stated that Williams had never gone to Tucson without telling her in advance. Williams's father stated that he was "not exactly sure why [Williams] came" to Tucson, but when Williams was there, he asked for money to purchase a new cell phone. His father also stated that he had been at work until 1:30 a.m. the morning of August 19th, and did not know Williams had come to visit him until 9:00 a.m. the following morning. Williams's wife also testified that they had plans for the evening of August 18th to go to dinner for her birthday.

¶11 Williams's father also revealed that he had a "disagreement" with Williams over money roughly two weeks prior to Williams going to Tucson. Williams was upset with him because he had given money to Williams's wife to help with the children, but restricted Williams from accessing that money. His father revealed that he pushed Williams to find a job so that he could pay him back. Williams's wife testified that Williams had a history of frequently quitting jobs after just starting them, and he would sometimes lie and neglect to tell her when he quit or lost a job. She also testified that they recently purchased the vehicle Williams was using in August 2016 with a loan from Williams's step-grandfather. Williams's step-grandfather testified that they were supposed to pay $350 each week, beginning the week of August 19, until the loan was paid off; however, Williams did not make any payment until August 31, and then only paid $300.

¶12 After the State rested, Williams moved for a directed verdict pursuant to Arizona Rule of Criminal Procedure ("Rule") 20, but the trial court denied the motion, finding that there was substantial evidence to allow the case to go to the jury. The jury found Williams guilty, as charged, of second-degree murder. The court sentenced Williams to a slightly mitigated term of fourteen years' imprisonment, with 354 days of presentence-incarceration credit.

¶13 Williams timely appealed. We have jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution, and Arizona Revised Statutes ("A.R.S.") sections 12-120.21(A)(1), 13-4031, and -4033(A)(1).

**DISCUSSION**

¶14        Williams raises three arguments on appeal.  First, Williams challenges the trial court's denial of his Rule 20 motion for a judgment of acquittal; second, that the trial court erred by providing a flight instruction over Williams's objection; and third, that the trial court erred by denying his request for a mere presence instruction.

## I.        Judgment of Acquittal

¶15        Williams maintains that the State did not present sufficient evidence to sustain a conviction.  A judgment of acquittal is appropriate only when "there is no substantial evidence to support a conviction." Ariz. R. Crim. P. 20(a)(1).  We review claims of insufficient evidence de novo, *State v. West*, 226 Ariz. 559, 562, ¶ 15 (2011), but "view the evidence and all reasonable inferences in the light most favorable to sustaining the jury's verdicts," *State v. Holle*, 240 Ariz. 300, 301, ¶ 2 (2016).  In this light, we must determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *West*, 226 Ariz. at 562, ¶ 16 (quoting *State v. Mathers*, 165 Ariz. 64, 66 (1990)).  Sufficient evidence may be circumstantial or direct, *id.*, and we neither reweigh conflicting evidence nor reevaluate the credibility of witnesses, *State v. Borquez*, 232 Ariz. 484, 487-88, ¶¶ 9, 12 (App. 2013).

¶16        To support a conviction of second-degree murder, the State must show that Williams, without premeditation, "intentionally cause[d] the death" of S.H., or "cause[d] the death" of S.H. by "conduct" Williams knew would "cause death or serious physical injury," or "[u]nder circumstances manifesting extreme indifference to human life, [Williams] recklessly engage[d] in conduct that create[d] a grave risk of death and thereby cause[d] the death" of S.H. A.R.S. § 13-1104(A)(1)–(3).  The State presented evidence that S.H. was stabbed around 9:30 a.m.  *See supra* ¶ 4. S.H. was discovered in his vehicle shortly before 11:00 a.m. and an autopsy revealed that S.H.'s cause of death was multiple stab wounds of the chest, including one fatal stab wound that penetrated his heart.

¶17        The State presented evidence of cell phone activity showing that Williams was present in the same general area where S.H.'s body was discovered at the times leading up to and right after the murder. *See supra* ¶ 7. Forensic evidence showed that DNA evidence matching Williams was found on the inside of S.H.'s vehicle.  Williams's left ring-finger fingerprint was also found on the exterior front driver's door.  Most notably, the jury was presented with significant evidence that Williams lied on multiple

occasions and gave inconsistent statements to the Detective and at trial about his contact with S.H. and his whereabouts on August 18th. First, Williams admitted that he was at the fitness center parking lot the morning of August 18th, but he gave inconsistent accounts of car troubles. Second, during his interview with the Detective, he denied ever seeing S.H. and stated that he did not interact with anyone while he was in the parking lot. At trial, however, he testified that he did speak with S.H. and even sat in his car for some time. Third, Williams claimed his trip to Tucson to visit his father had been planned and his wife was aware of the trip, yet both his wife and father stated that they were unaware that he was going to Tucson on August 18th. The State argued Williams's motive was "a robbery that had gone awry," and ample evidence was presented to show Williams's financial difficulties to corroborate that theory. *See supra* ¶¶ 10-11.

¶18        After viewing this evidence in the light most favorable to sustaining the verdict, a rational jury could have found evidence to prove the essential elements of second-degree murder beyond a reasonable doubt. *See State v. Fulminante*, 193 Ariz. 485, 494, ¶¶ 27-28 (1999) (finding that defendant's "several false, misleading, and inconsistent statements to police, other witnesses, and his wife," along with evidence of motive, opportunity, and the absence of a rational explanation, provided sufficient evidence to allow a reasonable jury to "piece[] together a web of suspicious circumstances" to sustain a conviction).

## II.        Flight Jury Instruction

¶19        Williams contends that the trial court erred by giving a flight instruction over his objection because it was unsupported by any evidence. "We review the trial court's decision to give a flight instruction for abuse of discretion." *State v. Parker*, 231 Ariz. 391, 403, ¶ 44 (2013); *see also State v. Anderson*, 210 Ariz. 327, 343, ¶ 60 (2005).

¶20        A flight instruction should only be given if the State presents evidence of flight after a crime from which jurors can infer a defendant's consciousness of guilt. *Parker*, 231 Ariz. at 403, ¶ 44; *State v. Bible*, 175 Ariz. 549, 592 (1993) ("[T]here must be evidence of flight from which can be inferred a consciousness of guilt *for the crime charged*."). In *State v. Smith*, our supreme court established a two-part test to determine if the evidence warrants a flight instruction. 113 Ariz. 298, 300 (1976) (citing *State v. Rodgers*, 103 Ariz. 393 (1968)). First, "the evidence is viewed to ascertain whether it supports a reasonable inference that the flight or attempted flight was open, such as the result of an immediate pursuit." *Id.* Second, if there is no open flight, "then the evidence must support the inference that the

accused utilized the element of concealment or attempted concealment." *Id.* "The absence of any evidence supporting either of these findings would mean that the giving of an instruction on flight would be prejudicial error." *Id.* (citing *State v. Castro,* 106 Ariz. 78 (1970)); *see also State v. Speers*, 209 Ariz. 125, 132, ¶ 28 (App. 2004) (noting that the test requires that flight evidence allows the jury to "be able to reasonably infer from the evidence that the defendant left the scene in a manner which obviously invites suspicion or announces guilt").

**¶21**        The flight instruction was warranted in this case.  The record reflects that the murder occurred the morning of August 18, 2016.  Cell phone data extraction put Williams at the scene of the crime during the time that S.H. was stabbed.  A few hours after S.H. was murdered, Williams left the county and drove to Tucson despite having plans to celebrate his wife's birthday that evening.  There was no activity on Williams's cell phone for the next 33 hours following his departure for Tucson.  Williams's trip to Tucson was unexpected and unplanned. *Supra* ¶ 10.  And on his arrival in Tucson, Williams asked his father for money to get a new cell phone. *Supra* ¶ 10.  Thus, there was sufficient evidence from which a jury could infer "that [Williams] left the scene in a manner which obviously invites suspicion or announces guilt." *Speers,* 209 Ariz. at 132, ¶ 28; *see also Parker*, 231 Ariz. at 404, ¶¶ 48-49 (flight instruction was proper where the defendant "fled from his residence rather than toward it and had no previous plans to leave"). Furthermore, to the extent Williams argues that there was insufficient evidence to support "immediate pursuit," this argument also fails as flight does not have to be "immediate." *See State v. Edwards*, 136 Ariz. 177, 184 (1983) (defendant's argument that his flight fifteen months after the crime occurred was insufficient to support an inference of guilt was rejected); *State v. Earby*, 136 Ariz. 246, 249 (App. 1983) (finding flight instruction proper where defendant fled to another state the morning after shooting the victim).

## III.    Mere-Presence Jury Instruction

**¶22**        Williams argues that the trial court erred by denying his request for a mere-presence instruction.  "We review a trial court's denial of a requested jury instruction for abuse of discretion." *State v. Rosas-Hernandez*, 202 Ariz. 212, 220, ¶ 31 (App. 2002).

**¶23**         "A party is entitled to an instruction on any theory of the case reasonably supported by the evidence." *State v. Shumway*, 137 Ariz. 585, 588 (1983).  The trial court is not required to give a jury instruction, however, if the substance of that instruction is adequately covered by other

instructions. *State v. Mott*, 187 Ariz. 536, 546 (1997). The test is whether the instructions, viewed in their entirety, adequately set forth the law applicable to the case. *State v. Rodriguez*, 192 Ariz. 58, 61-62, ¶ 16 (1998). Further, the instructions must not mislead the jury. *State v. Noriega*, 187 Ariz. 282, 284 (App. 1996). The failure to give an instruction is not reversible error unless it is prejudicial to the defendant and the prejudice appears in the record. *State v. Barr*, 183 Ariz. 434, 442 (App. 1995).

¶24 Here, the trial court initially gave a mere-presence instruction, but was uncertain if the instruction would remain because Williams also requested an alibi instruction. The court later notified the parties that, after further research, it would give the alibi instruction, but not the mere-presence instruction. The court explained:

> Mere presence doesn't apply in this case . . . because that's not what the defense is. . . . The defense is not that the defendant was at the crime scene at the time the murder occurred. His defense is he wasn't there when the crime occurred. He was there previously . . . and then he got in his car and took off, not that he was there at the time the crime was committed and he was an innocent bystander and watching it and observing it as the crime was committed. That's not the defense in this case, and there's no evidence to suggest same.

¶25 The trial court properly rejected the requested mere-presence instruction. Williams continuously maintained, both throughout trial and during closing arguments, that he was not present in the fitness center parking lot when the murder took place. *See State v. Bruggeman*, 161 Ariz. 508, 510 (App. 1989) ("Closing arguments of counsel may be taken into account when assessing the adequacy of jury instructions."). His defense was that he was not present when the crime occurred. Williams even claimed that S.H. drove away after Williams was able to start his car again, and that he subsequently left the parking lot after. Therefore, the mere-presence instruction was not required as there was no evidence produced to support the theory. *Cf. Noriega*, 187 Ariz. at 284-86 (court should have given a mere-presence jury instruction where the defendant's mere presence was a central theory of his defense as he was charged with accomplice liability based on actual presence).

¶26 Moreover, no error occurred because the jury instructions, as a whole, adequately covered the law. The jury was properly instructed that they could only find Williams guilty if he "intentionally caused the death of [S.H.]," or "caused the death of [S.H.] by conduct which [Williams] knew

would cause death or serious physical injury," or "[u]nder circumstances manifesting extreme indifference to human life, recklessly engaged in conduct which created a grave risk of death and thereby caused the death of [S.H.]." *See State v. Doerr*, 193 Ariz. 56, 65, ¶ 35 (1998) ("Where the law is adequately covered by instructions as a whole, no reversible error has occurred."). The jury thus found that Williams was not just present at the scene of the crime—they found that he either caused S.H.'s death or recklessly engaged in conduct which created a grave risk of S.H.'s death. *See id.* ("We will reverse only if the instructions, taken together, would have misled the jurors.").

**CONCLUSION**

¶27　　　　For the foregoing reasons, we affirm Williams's conviction and sentence.



AMY M. WOOD • Clerk of the Court
FILED: AA