NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

THE RICARDO S. AND ILDA G. FERNANDEZ
REVOCABLE LIVING TRUST, by and through
ILDA G. FERNANDEZ, Trustee,
*Plaintiffs/Appellants*,

*v.*

GEORGE R. RIPPS; FRIPPS MOHAVE
CONSTRUCTION LLC,
*Defendants/Appellees*.

No. 1 CA-CV 18-0562
FILED 8-20-2019

---

Appeal from the Superior Court in Mohave County
No. S8015CV201700203
The Honorable Charles W. Gurtler, Jr., Judge

**REVERSED AND REMANDED**

---

COUNSEL

Grynkewich Law Offices, Las Vegas, NV
By Gary S. Grynkewich
*Counsel for Plaintiffs/Appellants*

The Kozub Law Group, PLC, Scottsdale
By Richard W. Hundley
*Counsel for Defendants/Appellees*

---

## MEMORANDUM DECISION

Judge Diane M. Johnsen delivered the decision of the Court, in which Presiding Judge Paul J. McMurdie and Judge Peter B. Swann joined.

---

**J O H N S E N**, Judge:

**¶1**        Ilda Fernandez, on behalf of the Ricardo S. and Ilda G. Fernandez Revocable Living Trust ("the Trust"), appeals the superior court's entry of summary judgment in favor of defendants George and Mercedes Ripps and Fripps Mohave Construction, LLC.  Because the evidence establishes genuine issues of material fact as to the two loan defaults the Trust alleged, we reverse and remand for further proceedings.

## FACTS AND PROCEDURAL HISTORY

**¶2**        During the final years of his life, Ricardo Fernandez became friends with George Ripps, who owns Fripps, a homebuilding company.  Fernandez, a retired accountant, performed bookkeeping services for Fripps at no charge and frequently loaned money to the company.  To make many of the loans, including those relevant to this appeal, Fernandez drew money from a checking account belonging to the Trust, of which Fernandez and his wife, Ilda, were the beneficiaries.

**¶3**        Most of the loans Fernandez made to Fripps were undocumented and unsecured.  In January 2015, however, Fripps recorded three deeds of trust, each naming Fernandez as beneficiary.  Each deed secured a specified amount of debt and granted Fernandez a security interest in land, referred to by the parties as "the Motherlode property," upon which Fripps planned to build a home.  The first deed secured a loan of $72,200 made the day before the deeds were recorded.  The second deed secured a loan of $55,000 Fernandez made to Fripps in five installments during January and February 2015.  And the third deed secured a total of $37,700, the purpose and origin of which are disputed.

**¶4**        After completing the home on the Motherlode property, Fripps sold it in July 2015.  At some point before close of escrow, Fernandez submitted a payoff demand to the escrow company for $124,900, which was $40,000 less than the total amount secured by the three deeds of trust.  Upon receipt of the $124,900, Fernandez signed a "Beneficiary's Deed of Full

Release" as to each deed. Each stated, "the indebtedness and/or obligations secured by the Deed of Trust executed by Fripps Mohave Const, as Trustor, and Richard Fernandez, as Beneficiary . . . has been fully paid, satisfied and discharged."

**¶5**        Thereafter, Fernandez continued to make smaller undocumented and unsecured loans to Fripps until he died in July 2016. In September 2016, Ripps delivered a $5,500 check to Fernandez's home, claiming that amount covered all of the company's outstanding debt to Fernandez.

**¶6**        After Fernandez died, his son Daniel Fernandez began acting as co-trustee and custodian of records for the Trust. Daniel examined records in his father's office, including statements from the Trust's checking account, a checkbook for the same account and handwritten notes in a folder on top of Fernandez's office desk. His review led the Trust to conclude that Fripps still owed the Trust approximately $60,000 – $40,000 from the Motherlode loans and $20,000 on other unsecured loans. The Trust filed suit against Fripps, alleging breach of contract, unjust enrichment and fraud and seeking an accounting.

**¶7**        After discovery, Fripps moved for summary judgment. The superior court granted the motion, dismissed all the Trust's claims and awarded Fripps attorney's fees and costs. The Trust timely appealed. We have jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution, and Arizona Revised Statutes ("A.R.S.") sections 12-120.21(A)(1) (2019) and -2101(A)(1) (2019).[1]

## DISCUSSION

**¶8**        Summary judgment is appropriate when "the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Ariz. R. Civ. P. 56(a); *Orme Sch. v. Reeves*, 166 Ariz. 301, 305 (1990). We review entry of summary judgment *de novo*, viewing the evidence and all reasonable

---

[1]        Absent material revision after the relevant date, we cite the current version of a statute or rule.

3

inferences therefrom in the light most favorable to the non-moving party. *Andrews v. Blake*, 205 Ariz. 236, 240, ¶ 12 (2003).[2]

## A. Debt Secured by the Deeds of Trust.

### 1. Section 33-707(A) is not dispositive.

¶9 The Trust argues a genuine issue of material fact exists as to whether Fripps owes $40,000 remaining on the loans secured by the deeds of trust.[3] Fripps argues in response that the releases Fernandez executed in July 2015 are as a matter of law "conclusive evidence" that nothing more was owed.

¶10 The superior court assumed the truth of the Trust's assertion that the three deeds of trust secured loans totaling $164,900. The undisputed evidence before the court was that Fripps had repaid only $124,900 of that amount. But the court concluded that, under A.R.S. § 33-707(A) (2019), Fernandez relinquished any claim to collect the balance when he executed and delivered the three deed releases.

¶11 Under § 33-707(A), a "recorded . . . deed of release and reconveyance constitutes conclusive evidence of full or partial satisfaction and release of the . . . deed of trust in favor of purchasers and encumbrancers for value and without actual notice." A.R.S. § 33-707(A). Fripps argues, as the superior court concluded, that § 33-707(A) bars the Trust's claim for any amount still owing on the loans secured by the deeds.

¶12 Fripps fails to appreciate, however, that although the statute expressly addresses satisfaction of the *deed of trust*, it does not address satisfaction of the *underlying debt*. The two are not the same. *See Maine v. Clack*, 43 Ariz. 492, 498 (1934) ("A mortgage is not a debt, but merely security

---

[2] The Trust asks us to strike the statement of the case from Fripps's answering brief because it does not include citations to the record as required by Arizona Rule of Civil Appellate Procedure 13. We grant the motion and will disregard the portion of Fripps's brief not supported by record citations. *See Flood Control Dist. of Maricopa County v. Conlin*, 148 Ariz. 66, 68 (App. 1985).

[3] The only arguments the Trust raises on appeal concern the superior court's entry of judgment against Fripps on the Trust's claims for breach of contract. For that reason, we will not address the court's dismissal of the Trust's other claims against Fripps or its dismissal of George and Mercedes Ripps.

for the payment of the debt, and the release of security in and of itself does not necessarily release the original indebtedness."). Under the statute, the act of recording the release document is a legally significant event – it effects a release of the deed of trust. Yet the statute says nothing about the debt secured by the deed of trust. Although § 33-707(A) provides that a recorded lien release is conclusive evidence of release of the deed of trust, the statute does not likewise provide that the release is conclusive evidence of satisfaction of the debt secured by the deed of trust.

¶13        To be sure, apart from the statute, the releases stated that Fripps had satisfied all obligations secured by the deeds. Each stated, "the indebtedness and/or obligations secured by the Deed of Trust . . . has been fully paid, satisfied and discharged." Fripps argues that, by executing releases containing this language, Fernandez waived his right to collect any unpaid amounts intended to be secured by the deeds of trust. *Cf. Maine*, 43 Ariz. at 498 (release did not serve "to release any portion of the original indebtedness" because it did not "state that the mortgage and debt secured thereby [were] *paid*").

¶14        The Trust does not dispute that Fernandez himself executed each of the three lien releases. The Trust argues, however, that the documents, written notes and calculations Fernandez left behind create a genuine issue of fact about whether, notwithstanding the releases, some $40,000 originally secured by the deeds of trust remains owing from Fripps. As detailed in the next section of this decision, we agree. The documents, notes and calculations, coupled with the absence of evidence that Fripps repaid the amounts originally secured by the deeds of trust, are sufficient to create a triable issue of fact. In other words, viewing the evidence in the light most favorable to the non-movant, a reasonable juror could conclude that a debt was owed and not released.

### 2.    Amounts secured by the third deed of trust.

¶15        Having decided that the lien releases do not conclusively bar the Trust's claim, we must now address a question the superior court did not, which is whether any amounts were owing after Fripps repaid the $72,200 and $55,000 loans secured by the first two deeds of trust on the Motherlode property. The Trust suggests the third deed of trust was executed to secure a balance of about $33,000 due on prior unsecured loans and "an accrued amount of interest" owing on that balance and on the two loans secured by the first two deeds of trust. In support of this theory, the Trust offered Fernandez's handwritten notes, which include what the Trust claims are calculations of interest that, when added to the $33,000

outstanding balance, totals to approximately $37,700. On summary judgment, Ripps submitted an affidavit denying Fernandez ever charged Fripps interest. Instead, Fripps argues the third deed of trust was recorded just in case Fripps needed to come to Fernandez for more funds to complete the Motherlode project. Fripps claims the deed of trust ended up a nullity because the company did not need to borrow anything more to finish the work.

¶16        At the outset, Fripps argues the parole evidence rule bars the Trust from offering evidence that would "vary or contradict" the release of the third deed of trust. But Fripps offers no legal authority for the proposition that a release of a lien is a contract that might be subject to the parole evidence rule.

¶17        Fripps also argues that the notes and calculations found on Fernandez's desk are inadmissible hearsay. But we conclude the notes are records of regularly conducted activity that are admissible as an exception to the rule against hearsay pursuant to Arizona Rule of Evidence 803(6). Under Rule 803(6), a document may be admitted if: (1) it was made at or near the time by someone with knowledge; (2) it was kept in the course of a regularly conducted activity of a "business . . . occupation, or calling"; and (3) making the record was a regular practice of that activity.

¶18        In connection with the summary judgment motion, Fernandez's son Daniel provided an affidavit stating that his father was a "bookkeeper/accountant" before he retired to Kingman; thereafter, Fernandez maintained a home office, where "he conducted his regular activities of maintaining" his books and records and those of the Trust. As Daniel explained, after Fernandez retired, managing the Trust "was unequivocally [his] primary occupation."

¶19        Daniel stated that his father kept documents pertaining to himself, his wife and the Trust in a large briefcase behind his chair in his home office. Another large briefcase behind the chair contained records "from various business activities of George Ripps . . . or pertaining to one or more of his various business interests."[4]

---

[4]        Daniel stated that, based on conversations with his father, "it was clear" Fernandez believed he had a "very close bond and friendship" with Ripps. According to Daniel, his father told him "on several occasions" that he was frustrated by delays in Ripps's repayment of the loans made to him,

¶20        According to his son, Fernandez "active[ly] manage[d]" the "assets, income and investments" of the Trust, "paid close, regular and constant attention" to them and "was meticulous in maintaining" his financial records.  Daniel averred that Fernandez did not use a computer but instead "meticulously and regularly entered every transaction . . . by hand into" ledgers, "which he maintained, analyzed and updated routinely."  Fernandez also "regularly reconciled the Trust's accounts as provided by applicable investment and banking entities individually and collectively" with his handwritten ledgers.  Daniel further averred that, beyond the Trust documents kept in the briefcase, after his father died, he found other documents "neatly organized" in a folder on Fernandez's desk, which reflected Fernandez's "'active' work" on financial matters.  Among the items in the folder on the desk were some handwritten notes, which included columns of numbers and calculations.  Daniel stated he knew his father's handwriting well and recognized the handwritten notes as his father's.

¶21        Daniel's statements show the notes were kept in the course of what had become Fernandez's "business . . . occupation, or calling," and were made as a "regular practice" of Fernandez's activity of maintaining the financial papers of the Trust and of Fripps.  *See* Ariz. R. Evid. 803(6).  Fernandez undoubtedly had knowledge of the loans he made to Fripps, and the dates included in the notes show they were made "at or near the time" of the deeds of trust, the loans or the repayments at issue.  *See id.*

¶22        Moreover, the affidavit adequately satisfies the requirement of Rule 803(6)(D) that the conditions be "shown by the testimony of . . . [a] qualified" witness, namely Fernandez's son.  *See* Ariz. R. Evid. 803(6)(D); *see*, *e.g.*, *State v. Petzoldt*, 172 Ariz. 272, 275 (App. 1991) (testimony of associate that making handwritten records was a "regular practice" in defendant's marijuana business supported admission of notebook containing handwritten entries of sales).  And Fripps has not shown that "the method or circumstances of preparation indicate[d] a lack of trustworthiness" of the notes.  *See* Ariz. R. Evid. 803(6)(E).  Viewed closely, the Fernandez notes create a genuine issue of fact about the Trust's claim that Fripps owes approximately $40,000 as reflected by the third deed of trust.

---

but said his father was reluctant to "pressure [Ripps] for immediate repayment due to not wanting to jeopardize what he perceived as their deep friendship."

¶23        This claim by the Trust relies in large part on Exhibit H to the Affidavit of Daniel R. Fernandez. At the top left of the second page of that Exhibit H is a column of entries that appear to reflect loans by Fernandez to Fripps, and Fripps's payments on those loans, from November 22, 2013 through October 8, 2014, leaving a balance owing of $49,000. The final entry in the column indicates an interest charge of $3,131.50, which, when added to the balance, sums to $52,131.50. At the top right of the same page is another column of entries apparently reflecting additional loans and payments between Fernandez and Fripps from November 22, 2013 through January 20, 2015, including a payment to Fernandez on January 20, 2015, of $52,131.50.[5] Thus, contrary to Fripps's contention, these notes, along with associated bank records, reflect that before the loans made in connection with the Motherlode project, Fernandez charged interest when he loaned money to Fripps, and Fripps paid that interest.

¶24        The notes also show that Fernandez calculated interest due on other loans to Fripps pending at the same time and, most significantly, on the loans he made to Fripps in connection with the Motherlode property. Returning to Exhibit H, the result of the transactions reflected in the column at the top right of the second page of the exhibit (after the payment by Fripps of $52,131.50) was an outstanding balance of $29,000 as of January 20, 2015. On the bottom of the second page of the exhibit are calculations of 5 percent interest through April 20, 2015 on (1) the $29,000 outstanding balance, (2) a $4,000 loan made on November 22, 2013, and (3) the $127,200 in loans (made between January 20 and February 24, 2015), that, as Fripps concedes, corresponded with the first two deeds of trust.[6] The principal and interest on those loans, as shown on the next page, sum to $164,889.48. Subtraction of $127,200 (the total principal of the first two deed of trust loans) from that total leaves a balance of $37,689.48. This balance approximates the amount secured by the third deed of trust ($37,000), suggesting that deed was intended to secure interest and principle owing on various other loans Fernandez had made to Fripps, along with interest

[5]        This payment, along with another payment the same day to Fernandez of $55,250, are reflected in a deposit of $107,381.50 in the Trust's bank statement.

[6]        The transactions reflected in the column at the top right of the second page, which result in the $29,000 balance, appear to include this $4,000 loan. Yet Fernandez calculates interest on the $4,000 loan separately on page three of the exhibit.

accruing on the loans secured by the first two deed of trust, as of April 20, 2015, 90 days after the deeds were executed.

**¶25** There is no evidence that Fripps made any payment to Fernandez on April 20, 2015, however, and additional notes on page two of Exhibit H show calculations of interest accruing after that date. Specifically, the notes show calculations of 5 percent daily interest on the outstanding loans (1) from April 20, 2015 to May 31, 2015, and (2) from June 1, 2015 to July 15, 2015. This interest, added to the previously calculated balance as of April 20, 2015 ($164,889.48), sums to $166,777.18 "at 7/15/15," as reflected in the notes. Together, the calculations can be read to mean that before the Motherlode payoff, Fernandez believed Fripps owed the Trust a total of $166,777.18. The figures on the second page of Exhibit H then reflect Fripps's July 15, 2015 payment of $124,900 on the loans secured by the first two deeds, leaving a balance owing of $41,877.18.[7] Notably, the calculations then show the addition of $6,000 to the balance, an amount Fernandez loaned to Fripps on May 4, 2015.[8]

**¶26** Similar interest and payoff calculations were found in other notes Fernandez made, which the Trust produced to Fripps in discovery, and which Fripps submitted to the court with its summary judgment motion. Moreover, beyond the Fernandez notes, the Trust also offered the Fripps balance sheet, which showed a liability (debt) owed to Fernandez in the amount of $60,000 as of December 31, 2015.

**¶27** In sum, the documents the Trust offered on summary judgment from Fernandez's desk, along with bank documents, the other notes Fripps offered and the Fripps balance sheet, are sufficient to create a

---

[7] To be sure, another column on the same page of the exhibit reflects a balance slightly higher than $41,877.18. The higher balance appears to have been reached by calculations similar to those detailed above – that is, by adding the principal of all outstanding loans to interest on those loans from the date of issuance to July 15, 2015. The calculations performed to reach the higher balance, however, appear to have included interest on the $29,000 loan twice, perhaps erroneously. Which column is correct and, more foundationally, whether the notes ultimately establish an amount still owing at Fernandez's death, will be for the trier-of-fact to decide.

[8] Fernandez appears to have calculated interest by multiplying a loan balance by the number of days outstanding, then dividing that total by 7,300 (which is the mathematical equivalent of multiplying by .00013699 or .05/365).

genuine issue of fact as to whether Fripps agreed to pay interest on the loans it received from Fernandez and, if so, the total amount of interest that remains owing. Fripps does not contend that it paid any interest due on the loans (indeed, George Ripps testified no interest was owed), and because we have held the lien releases did not conclusively establish that amounts secured by the third deed of trust were satisfied, these factual matters must be resolved on remand.

**B.      The $20,000 Outstanding Loan Balance.**

**¶28**          The Trust also argues the superior court erred by entering summary judgment in favor of Fripps on the Trust's claim to recover at least $20,000 owing on two other loans: (1) a $6,000 loan made by check dated May 4, 2015, and (2) a $14,000 loan made by check dated December 1, 2015.

**¶29**          Viewed in context of the parties' ongoing financial relations at the time, the evidence before the superior court on summary judgment establishes a genuine issue of material fact as to these alleged loans. Statements from Fernandez's checking account show the following transactions:

| Date[9] | Checks made out to Fripps | Deposits reflecting Fripps's payments to Fernandez |
| --- | --- | --- |
| 5/4/2015 | $6,000 | |
| 7/28/2015 | $25,000 | |
| 7/28/2015 | $5,000 | |
| 8/11/2015 | | $20,000 |
| 9/3/2015 | | $5,000 |
| 10/1/2015 | | $5,000 |
| 11/30/2015 | $14,000 | |

---

[9]      For purposes of consistency, the table shows the date each check cleared the bank, as shown in the statements. The dates shown therefore differ slightly from the dates shown on each check image and in Fernandez's checkbook ledger, which also were before the court.

The record also contains images of the four checks Fernandez wrote to Fripps to make the loans, as well as an image of the August 11, 2015, check in the amount of $20,000 from Fripps to the Trust. Neither party provided images of checks related to the $5,000 deposits made on September 3 and October 1, 2015, however, and in the bank statements they are simply labeled "Branch Deposit."[10]

¶30 These records show that as of July 28, 2015, Fernandez had made new loans to Fripps totaling $36,000, and that on November 30, 2015, Fernandez loaned Fripps another $14,000. At that point, Fripps owed Fernandez a total of $50,000 in new loans (over and above the debts discussed in Part A of this decision). According to the Trust, the records show Fripps repaid only $30,000, leaving $20,000 still outstanding.

¶31 In response, Fripps (1) admits Fernandez loaned it $6,000 on May 4 and (2) does not contest that Fernandez made it two additional loans totaling $30,000 on July 28. Fripps's argument hinges on the payment of $20,000 it made to Fernandez on August 11. Fripps suggests the $20,000 payment was an accidental over-repayment of the $6,000 loan rather than a partial repayment of the $36,000 it then owed, and asserts that the $14,000 Fernandez gave it on November 30 was not another loan but instead was meant to reimburse the overpayment upon Fernandez's realization of the mistake. Yet Fripps offers no explanation for how it repaid the $30,000 loan. It only argues the Trust "provides no declaration or testimony of anyone with knowledge of an alleged other loan" – disregarding the Trust's production of images of the July 28 checks made out to Fripps totaling $30,000.

¶32 Fripps also fails to respond to evidence from Fernandez's checkbook, which the Trust cites as evidence the loans were not repaid. A May 1 entry in the checkbook shows a payment of $6,000 to "Fripps Mohave" and a decrease in the account balance of the same amount. A May 9 entry on the line below shows a deposit/credit of $6,000 labeled "Dep." and a corresponding increase in the account balance. But a question mark is written next to "Dep.," with a line pointing to "$6,000"; Fernandez's bank statements from the relevant period show the $6,000 withdrawal but do not

---

[10] Additional "Branch Deposits" appear throughout the bank statements and correspond to checks of equal value made out to Fripps, but neither party has argued the additional checks or deposits are relevant to the outstanding debt at issue.

show a corresponding $6,000 deposit; and the handwritten checkbook account balance is later corrected to reflect the absence of repayment.

¶33            A second page of Fernandez's checkbook shows a December 1 check of $14,000 to "Fripps Mohave Constr." and an account balance decreased accordingly. Several lines down, the checkbook appears to show a December 31 deposit of $14,000 and a correspondingly increased account balance. The number "$14,000" is marked over, however, and "Dep. Never paid" is written on the same line. The Trust's bank statements from the relevant period show the $14,000 check but do not show any corresponding $14,000 deposit. And at the last date of entry, the handwritten checkbook account balance listed differs from the account balance in bank records by approximately $14,000. Finally, written notes found on Fernandez's office desk, which Fripps submitted on summary judgment, show calculations of interest on the $14,000 "since 12/1/15," a calculation that would have been unnecessary were the payment simply a refund of Fripps's mistaken overpayment.

¶34            Rather than disputing the substance of this evidence, Fripps argues the handwritten checkbook is not "admissible or reliable" and is insufficient to rebut George Ripps's explanation of the loan arrangements. Although Fripps does not specify its evidentiary objection on appeal, it argued before the superior court that handwritten pages from the check register were inadmissible "on the grounds of lack of foundation and hearsay."

¶35            Because the checkbook is offered to prove the truth of the matters asserted – that certain amounts were withdrawn from and deposited in the Trust's checking account on particular days – it is hearsay. *See* Ariz. R. Evid. 801, 802. Nonetheless, the Trust argues the checkbook is admissible pursuant to the exception for records of regularly conducted activity. Ariz. R. Evid. 803(6); *see supra* ¶ 22.

¶36            Fernandez's checkbook satisfies each requirement of Rule 803(6). The checkbook entries are chronological, and the date listed for each check is the same as that written on the check itself. Bank statements show each check clearing several days after its corresponding checkbook entry, suggesting Fernandez wrote entries contemporaneously with writing checks or making deposits, rather than after the fact. Fernandez kept records of the Trust's transactions "in the course of" his regularly conducted activity of managing the Trust's finances, which included loaning the Trust's money to a company for which he provided bookkeeping services. And, as noted, Daniel Fernandez testified he recognized his father's

handwriting, was familiar with his father's habit of keeping organized financial records and found the checkbook in Fernandez's office. *Cf. State v. Parker*, 231 Ariz. 391, 402, ¶¶ 35-36 (2013) (co-worker's testimony that it was the author's habit to record or log hours each day and that he recognized author's handwriting was sufficient foundation to admit handwritten timesheets under Rule 803(6)); *Petzoldt*, 172 Ariz. at 275; *Sabatino v. Curtiss Nat. Bank of Miami Springs*, 415 F.2d 632, 634-35 & n.3 (5th Cir. 1969) (notebook in which decedent had "recorded checks and reconciled his statements" was admissible under the Federal Business Records Act).

¶37      Taken together, the bank records and checkbook pages establish a genuine issue of material fact as to the $20,000 that the Trust contends is owing, sufficient to withstand summary judgment.

## C.    Attorney's Fees.

¶38      The Trust does not request attorney's fees or costs on appeal, but Fripps does so pursuant to A.R.S. § 12-341.01 (2019). Because the Trust is the prevailing party, we decline to award fees to Fripps. The Trust is entitled to recover its costs. We vacate the superior court's award of fees to Fripps without prejudice to that court making a reasonable award of fees to the prevailing party at the conclusion of the case pursuant to § 12-341.01.

## CONCLUSION

¶39      For the foregoing reasons, we reverse the judgment of the superior court and remand for proceedings consistent with this decision.

